J-A23041-14

2014 PA Super 205

| THORSTEN STEPHAN, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| WALDRON ELECTRIC HEATING AND COOLING LLC, | |
| Appellant | No. 1960 WDA 2013 |

Appeal from the Judgment entered December 10, 2013,
in the Court of Common Pleas of Allegheny County,
Civil Division, at AR-12-003147

BEFORE:  DONOHUE, ALLEN, and MUSMANNO, JJ.

OPINION BY ALLEN, J.:                    **FILED SEPTEMBER 19, 2014**

Waldron Electric Heating and Cooling LLC, ("Appellant"), appeals from

the trial court's orders denying Appellant's preliminary objections, motion for

judgment on the pleadings, motion for summary judgment, and motion for

post-trial relief.[1]  After careful consideration, we reverse the trial court and

vacate the judgment in favor of Thorsten Stephan ("Stephan").

_____

[1] Appellant asserts that the order overruling Appellant's preliminary
objections was an "order overruling the Appellant's Motion for Judgment on
the Pleadings." Appellant's Brief at 3.  However, the trial court was only
presented with Appellant's preliminary objections in the nature of a
demurrer, and not a motion for judgment on the pleadings. *See generally*
Appellant's Preliminary Objections in the Nature of a Demurrer, 5/30/12, 1-2
(unnumbered).   The trial court's order was confined to Appellant's
preliminary objections.  *See* Order, 6/22/12, at 1.

Our review of the record reveals the following: On April 3, 2012, Stephan initiated an action against Appellant in the Allegheny County Magisterial District Court at docket number MJ-05235-CV-0000064-2012. On May 10, 2012, following a hearing, the magisterial district judge entered judgment in favor of Stephan in the amount of $1,319.00, plus filing fees of $94.00, for a total judgment of $1,413.00.

On May 18, 2012, Appellant appealed the judgment to the Allegheny County Court of Common Pleas. On May 21, 2012, Stephan, appearing *pro se*, filed a short form complaint alleging "extreme overcharging by [Appellant] for a minor home repair." Stephan's Complaint, 5/21/12, at 1. On May 30, 2012, Appellant filed preliminary objections in the nature of a demurrer. On June 19, 2012, Stephan filed a response to Appellant's preliminary objections.

In response to Appellant's preliminary objections, Stephan conceded that he "called [Appellant] that morning via The Yellow Pages for repair of sudden non-functioning of one of my electric outlets." *See* [R]e: Plead[ing] of [Stephan] v. [Appellant] in front of [the trial court] on June 22, 2012, 6/19/12, at 1 (unnumbered). Stephan expressed that Appellant's electrician "[b]efore he ever looked at the outlet … presented a company contract form detailing the price for the week-end trip and general information on possible diagnostic and repair work if needed. I was asked to read, sign and initial the paper at various places which I did." *Id.*

Stephan explained:

- 2 -

When [Appellant's electrician] finally checked the non-functioning electric outlet, he did not find any defect there. He asked me: Do you still want me to repair the problem? I said: Of course. His answer: That will cost you at least an extra $1,000 [dollars]. I was shocked. I asked: Do you expect such an extensive work up and repair? Do you mean to say that you may need to open some walls and replace some electric lines? He shrugged his shoulders. Finally I agreed. Do what you have to do. He was here and I owed him $300 [dollars] already for his visit even letting him go without work. []

After I had agreed verbally with further work, it did not take him more than a total of fifteen minutes to find and fix the problem. First he looked around the apartment for a few minutes without touching any fuses or other outlets. Then he went into the adjacent bedroom and opened 2 electric outlets, one after the other. The second unit showed a loose and burnt connection explaining the non-functioning of the electric outlet in the other room.

*Id.* After the loose and burnt connection was repaired, the electrician "completed the bill," which "added up to $1,469 [dollars] including t[he] $402 [dollars] for diagnosis and $721 [dollars] for repair." *Id.* at 2. Stephan asserted that "[t]he following Monday, I consulted a certified electrician referred by the manager of our condominium association. He reviewed the work and agreed with what was done[.]" *Id.*

On June 22, 2012, the trial court overruled Appellant's preliminary objections. On September 13, 2012, Appellant filed an answer and new matter. On September 14, 2012, an arbitration hearing convened, at the conclusion of which the arbitration panel found in favor of Stephan and awarded him $900.00. On September 18, 2012, Appellant appealed the arbitration award.

Appellant deposed Stephan on March 4, 2013. During his deposition, Stephan admitted that Appellant's electrician "had given [Stephan] some sort of price before he did the work[.]" N.T., Stephan's Deposition, 3/4/13, at 14. Stephan testified that Appellant's electrician "seemed like a pretty bright guy" and was "very competent." *Id.* at 31. Stephan denied that the electrician "was intimidating or threatening in any way to [Stephan]." *Id*. Appellant's electrical system has continued to function properly since the repair. *Id.* at 30. Stephan acknowledged signing a "final sign-off sheet" from Appellant's electrician, and that "where [Stephan's] name is written in it says, Satisfaction of work performed, work fully completed and prices acknowledged in advance and approved by buyer in writing[.]" *Id.* at 41-42. Stephan testified that he signed because "I knew already that I would cancel [the contract]." *Id.* at 42.

On June 13, 2013, Appellant filed a motion for summary judgment, which was scheduled for argument on August 26, 2013. On September 4, 2013, the trial court entered an order denying Appellant's motion for summary judgment. On September 12, 2013, the trial court conducted a non-jury trial. On September 13, 2013, the trial court issued a verdict in favor of Stephan, and against Appellant, in the amount of $1,000.00. On September 23, 2013, Appellant filed a motion for post-trial relief. On September 24, 2013, the trial court denied Appellant's motion for post-trial relief.

On October 1, 2013, Appellant filed a notice of appeal. On November 21, 2013, our Court quashed *sua sponte,* without prejudice, Appellant's appeal by *per curiam* order because final judgment had not been entered. In the interim, on October 10, 2013, the trial court ordered Appellant to file a concise statement of errors complained of on appeal. On November 1, 2013, Appellant filed its Pa.R.A.P. 1925(b) statement. On November 19, 2013, the trial court filed a memorandum in lieu of a Pa.R.A.P. 1925(a) opinion. On December 10, 2013, judgment was entered in favor of Stephan. That same day, Appellant filed this appeal.

Appellant presents the following issues for our review:

1. Did the Trial Court err in failing to grant the Appellant's Preliminary Objections in the Nature of a Demurrer where [Stephan] failed to plead any material fact that could give rise to any legitimate cause of action upon which the Appellant could effectively base his legal defense?

2. Did the Trial Court further err in denying the Appellant's Motion for Summary Judgment when, even taken in a light most favorable to [Stephan], the complained of factual basis and record as a whole, contain no legitimate cause of action, and, most strikingly, when [Stephan] undisputedly entered into a contractual agreement with the Appellant with a fraudulent intent?

3. Did the Trial Court err when it denied a Motion for a Directed Verdict made by the Appellant even though [Stephan] failed to sustain, during his case in chief, the legal burden of his allegation, and even though he admitted, under oath, to committing fraud in the inducement of the contract with the Appellant?

4. Did the Trial Court err and abuse its discretion when it entered a verdict for [Stephan] and against the Appellant despite the lack of any valid, legal cause of action and the undisputed understanding of the written contractual terms and obligations

- 5 -

by the parties, as well as the admitted fraudulent purpose and motivation of [Stephan].

5. Lastly, did the Trial Court err and abuse in discretion by finding in favor of [Stephan] and then by further failing to grant the Appellant's Motion for Reconsideration based upon the issues currently at bar?

Appellant's Brief at 8-9.

After carefully scrutinizing the record, we find that the trial court erred in entering judgment in favor of Stephan. Since our determination is dispositive of this appeal, we confine our analysis to this issue.

We have expressed:

Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason. Similarly, the trial court abuses its discretion if it does not follow legal procedure.

*Lachat v. Hinchcliffe,* 769 A.2d 461, 487 (Pa. Super. 2001).

It is well-settled:

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue … concerns a question of law, our scope of review is plenary.

The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court

because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

***Wyatt, Inc. v. Citizens Bank of Pennsylvania***, 976 A.2d 557, 564 (Pa. Super. 2009) (internal citations omitted).

Appellant contends that "[a]t issue here is the trial court's interpretation of the duties and obligations of a contract[.]" Appellant's Brief at 6. We recognize:

> The interpretation of any contract is a question of law and this Court's scope of review is plenary. Moreover, we need not defer to the conclusions of the trial court and are free to draw our own inferences. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

***Humberston v. Chevron U.S.A., Inc.,*** 75 A.3d 504, 509–10 (Pa. Super. 2013) (internal quotation marks and citations omitted).

We have explained:

> Contracts are enforceable when the parties reach a mutual agreement, exchange consideration, and have set forth the terms of their bargain with sufficient clarity. *Greene v. Oliver Realty, Inc.,* 363 Pa.Super. 534, 526 A.2d 1192 (1987). An agreement is sufficiently definite if it indicates that the parties intended to make a contract and if there is an appropriate basis upon which a court can fashion a remedy. *Id.* Moreover, when the language of a contract is clear and unequivocal, courts interpret its meaning by its content alone, within the four corners of the document. *Id.* (citing *Mears, Inc. v. National Basic Sensors,* 337 Pa. Super. 284, 289, 486 A.2d 1335, 1338 (1984)).

Traditional contract law distinguishes between bilateral and unilateral contracts. Bilateral contracts involve two promises and are created when one party promises to do or forbear from doing something in exchange for a promise from the other party to do or forbear from doing something else. *Id.* Unilateral contracts, in contrast, involve only one promise and are formed when one party makes a promise in exchange for the other party's act or performance. *Id.* Significantly, a unilateral contract is not formed and is, thus, unenforceable until such time as the offeree completes performance. *Id.*

***First Home Sav. Bank, FSB v. Nernberg,*** 648 A.2d 9, 14 (Pa. Super. 1994).

Moreover:

Traditional contract law distinguished between contracts involving two promises which were called bilateral and contracts involving only one promise which were called unilateral. Murray, *Contracts* at 9. A bilateral contract is created when one party promises to do or forbear from doing something in exchange for the other party's promise to do or forbear from doing something else. In a unilateral contract there is only one promise. It is formed when one party makes a promise in exchange for the other person's act or performance. *Id.* at 10. Mutuality of obligation means that both parties are under an obligation to perform their promises. It is often stated that a contract is unenforceable if there is no such mutuality but this principle is inapplicable to unilateral contracts. *See Darlington v. General Elec.,* 350 Pa. Super. 183, 203, 205, 504 A.2d 306, 316, 317 (1986). If A promises B $100 if B walks across the Brooklyn Bridge, a unilateral contract will be formed if B does as A requests. It is a unilateral contract because it consists of a promise in exchange for a performance. However, the contract is not formed until B walks across the bridge. At that time, A owes B $100 even though B no longer has any obligation to A. A unilateral contract is formed by the very act which constitutes the offeree's performance. Therefore, mutuality of obligation will never exist in such a situation. By the time the contract is formed, only the offeror will remain obligated. The offeree will already have performed. This is why the Restatement provides that: "If the requirement of consideration is met, there is no

additional requirement of ... (c) 'mutuality of obligation.'"
Restatement of Contracts (Second) § 79 (1981).

***Greene v. Oliver Realty, Inc.,*** 526 A.2d 1192, 1194-1195 (Pa. Super. 1987).

At trial, Stephan, appearing *pro se*, testified as follows:

> I'm charging [Appellant] for excessive over charging for a minor home repair.
>
> It was one Saturday in January, I think last year, that I called them for a nonfunctioning electrical outlet, and I had found a company in the Yellow Pages. I called them and they were very responsive and came very fast to my apartment where this happened. I have a condominium and the only thing is, he spent maybe less than an hour in my home, but most of the time **he asked me to fill out papers before he even looked at the defect** and after. Then he looked at the defect and within 15 minutes he had fixed it.
>
> **Before he never mentioned anything about cost of labor and price, then he checks the outlet and said, "it's fine, what do you want?" I said, "it doesn't work." He said, "do you want any other repair?" I said, "of course, fix it." So he said, "that will cost you another $1,000." I was shocked and flabbergasted. I said, "what do you plan to do, tear all my walls out?" He just said, "do you want it done or not?" I said to myself sooner or later I have to have it fixed so why not fix it right now.** But I couldn't imagine such a long and complicated work would follow. **So I said "yes, go ahead."** Within 15 minutes he had fixed everything. **He just walked around and checked various outlets in the apartment, found one that was defected** [sic] **in a different room, corrected it, there was a burnt-out, loose connection. He fixed it and that fixed the outlet in the other room.** Then came the next shock that he said, "okay, now that you're sitting down and filling out all the costs for this." Beside the visit, which was $90 which I agreed to on the phone, but then came the diagnosis and treatment and repair and suddenly it was $400 for the diagnosis and $700 for the repair and the total ended up $1,400. I was shocked.

> At the moment I didn't know what to do. **I said okay and I signed all the papers and, of course, in my mind I said within the next three days I have a way to contest this, which I did on Monday.**[2] I called American Express where I had written the check and said don't pay anything except $150 for what I felt was a fair deal. Of course, from then on it was a legal matter that they didn't respond to it. So I felt that this was excessive for 15 minutes of repair work which the rest was all paperwork.

N.T., 9/12/13, at 3-5 (emphasis supplied). Stephan corrected his testimony that the trip fee was actually $95.00, not $90.00, and that he was "not disputing that $95." *Id.* at 6.

During cross-examination, Stephan confirmed his deposition testimony that "even though [Stephan was] told the[] prices up front, [Stephan] didn't like the price, but [] wanted to have it fixed because it was a Saturday and [Stephan] wanted to use [his] computer and then [he] figured [he was] just going to cancel the transaction[.]" *Id.* at 16-17. Stephan also confirmed that "when [Appellant's] company came to [his] house," it "was … [Stephan's] expectation that if [Appellant] could find [Stephan's] problem and that if [Stephan and Appellant] had some understanding on a price that

_____

[2] During cross-examination, Stephan acknowledged signing "a three-day notice of cancellation," which made him "aware there was three days [he] could cancel" the contract. N.T., 9/12/13, at 11. Stephan further acknowledged signing "the emergency work authorization form." *Id.* at 11-12. The emergency work authorization required Stephan to "give up [his] right to cancel the transaction so [Appellant] can do the work" in Stephan's home. *Id.* at 12. Stephan testified that "I suppose I read it but I don't remember that I could not cancel within three days." *Id.* Stephan never sent back the three-day cancellation form to Appellant. *Id.* at 13-14.

[Appellant] would then fix [Stephan's] problem[.]" *Id.* at 18. Stephan acknowledged that Appellant's electrician "did fix the problem[.]" *Id.* Stephan testified that Appellant's electrician was "very competent, very sharp because within a few minutes he probably knew exactly where the defect was and how fast he could handle it and that's why I resent very much that he said 'that will cost you an extra $1,000 [dollars].'" *Id.* at 19. Stephan conceded that he did not "have any witnesses with [him,]" including any expert witnesses. *Id.* at 19-20. Stephan further agreed that "when the transaction was completed", he signed a portion of the contract indicating "the price of [$]1,469" and "that the work was completed and that [he] [was] satisfied with the work." *Id.* at 21.

In its memorandum in lieu of Pa.R.A.P. 1925(a) opinion, the trial court explained:

> During the bench trial of this matter, in assessing the credibility of each party, this Court found [Stephan] to be credible and [Appellant] to be not credible. This Court determined that [Appellant's] conduct was deceptive, unreasonable, and unjust. Moreover, based on the evidence presented by each party, this Court found [Stephan's] claim was supported by competent evidence.

Memorandum in Lieu of Opinion, 11/19/13, at 1 (unnumbered). Ordinarily, "[i]t is well established that the credibility of witnesses is an issue to be determined by the trier of fact. On appeal this Court will not revisit the trial court's determinations … regarding the credibility of the parties. Thus, [an] argument, which would require this Court to revisit and essentially reverse

the [trial court] on his credibility determinations, provides no grounds for relief." **Woods v. Cicierski,** 937 A.2d 1103, 1105 (Pa. Super. 2013) (internal citations omitted). Here, however, the trial court did not cite trial testimony, exhibits, or any specific basis for its credibility determinations. *See generally* Memorandum in Lieu of Opinion, 11/19/13. The trial court did not expound or set forth any specific grounds for its assertion that Stephan's claim was supported by competent evidence. *Id.* The trial court did not cite any case law in support of its verdict. Significantly, the trial court did not specifically respond to Appellant's contention that Appellant had a valid contract with Stephan, which Stephan had no legal basis to avoid. While our standard of review following a non-jury trial is deferential to the trial court, as is our standard of review regarding a trial court's credibility determinations, in this instance the trial court did not provide any supporting record references or jurisprudence for its judgment.

Based on our review of applicable contract principles and jurisprudence, as well as Stephan's own testimony, which the trial court found credible, we find that Appellant and Stephan entered into an enforceable contract for Appellant's repair of Stephan's electrical problem. Stephan was presented with Appellant's written contract. Stephan agreed to the work, even after the electrician expressly advised Stephan that the repair could be $1,000 in addition to the trip free of $95. The final bill of $1,469 is not grossly disparate from the minimum $1,095 of which Stephan was apprised, and agreed, that he would be incur for the repair.

Our determination that Stephan and Appellant had an enforceable contract is unchanged by Stephan's contention that the service prices were not entered until after the work was performed. We are mindful:

> If an essential term is left out of the agreement, the law will not invalidate the contract but will include a reasonable term. For instance, if the parties do not specify price, a court will impose a reasonable price which will usually be the item's market value. However, if the parties include the term but have expressed their intention ambiguously, the court will not impose a reasonable term and the contract may fail for indefiniteness. A court will not attempt to fix contractual terms which are inconsistent with the intent of the parties. That is because the paramount goal of contractual interpretation is to ascertain and give effect to the intent of the parties. When the language of a written contract is clear and unequivocal, its meaning must be determined by its contents alone. Only if the words used are ambiguous may a court examine the surrounding circumstances to ascertain the intent of the parties. [...]. Because courts wish to effectuate the parties' intentions, they may enforce an indefinite contract if its terms have become definite as the result of partial performance. One or both parties may perform in such a way as to make definite that which was previously unclear.

*Reg-Scan, Inc. v. Con-Way Transp. Services, Inc.,* 875 A.2d 332, (Pa. Super. 2005) (internal citation omitted) (emphasis supplied).

Further, we have explained:

> "A contract, implied in fact, is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from their acts in the light of the surrounding circumstances. *Cameron v. Eynon,* 332 Pa. 529, 3 A.2d 423 (1939)." *Home Protection Building & Loan Association Case,* 143 Pa. Super. 96, 98, 17 A.2d 755, 756 (1941). An implied contract is an agreement which legitimately can be inferred from the intention of the parties as evidenced by the circumstances and "the ordinary course of dealing and the common understanding of men." *Hertzog v. Hertzog,* 29 Pa. 465, 468 (1857).

> **"Generally, there is an implication of a promise to pay for valuable services rendered with the knowledge and approval of the recipient, in the absence of a showing to the contrary. A promise to pay the reasonable value of the service is implied where one performs for another, with the other's knowledge, a useful service of a character that is usually charged for, and the latter expresses no dissent or avails himself of the service. A promise to pay for services can, however, only be implied when they are rendered in such circumstances as authorized the party performing to entertain a reasonable expectation of their payment by the party benefited. The service or other benefit must not be given as a gratuity or without expectation of payment, and the person benefited must do something from which his promise to pay may be fairly inferred."** *Home Protection Building & Loan Association Case,* supra, 143 Pa. at 98–99, 17 A.2d at 756–57, citing 12 Am.Jur., Contracts, § 5. See also: *Irvine Estate,* 372 Pa. 110, 92 A.2d 544 (1952); *Gibb's Estate,* 266 Pa. 485, 110 A. 236 (1920). **When a person requests another to perform services, it is ordinarily inferred that he intends to pay for them, unless the circumstances indicate otherwise.** Restatement Restitution § 107(2) (1937). However, where the circumstances evidence that one's work effort has been voluntarily given to another, an intention to pay therefor cannot be inferred.

***Martin v. Little, Brown and Co.,*** 450 A.2d 984, 987 (Pa. Super. 1981) (emphasis supplied).

Instantly, we note that Stephan did not call any expert witnesses to testify as to the reasonable value of the services performed by Appellant's electrician at Stephan's home, on an emergency basis, on a Saturday afternoon. Moreover, Appellant's prices are contained in the contract, so there is no need to "impose a reasonable price based on the item's market value." ***Reg-Scan, Inc., supra.*** To the extent Stephan seeks to disavow the prices because he contends that they were added after the work was

completed, the timing of the inclusion does not necessarily make the prices, nor the parties' contractual intent to have Appellant repair Stephan's electrical problem, ambiguous. This contract does not fail for indefiniteness. Indeed, Stephan does not contest that he requested, wanted, and agreed, to have Appellant repair his electrical problem that Saturday, and that he agreed to incur at least $1,095 dollars to do so. We find that the record, including Stephan's own testimony, establishes that Appellant and Stephan entered into an enforceable contract for the electrical repair, which was completed by Appellant, such that Stephan was liable to Appellant in the amount of $1,469. We therefore vacate the judgment in favor of Stephan.

Judgment vacated. Jurisdiction relinquished.

Judge Donohue joins the Opinion.

Judge Musmanno filed a Dissenting Opinion.


Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/19/2014