J-A22009-18
J-A22010-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| BRUNO J. PASCERI, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICHAEL A. KARP, | |
| Appellant | No. 68 EDA 2018 |

Appeal from the Order Entered November 28, 2017
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): July Term, 2015 No. 798

| | |
|---|---|
| MICHAEL A. KARP, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BRUNO J.PASCERI, | |
| Appellant | No. 288 EDA 2018 |

Appeal from the Order Entered November 28, 2017
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): July Term, 2015 No. 798

| | |
|---|---|
| BRUNO J. PASCERI, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| MICHAEL A. KARP, | |
| Appellee | No. 651 EDA 2018 |

J-A22009-18
J-A22010-18

Appeal from the Order Entered January 24, 2018
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): July Term, 2015 No. 0798

BEFORE: BENDER, P.J.E., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.: **FILED FEBRUARY 05, 2019**

Appellant/Cross-Appellee, Bruce J. Pasceri, and Appellee/Cross-Appellant, Michael A. Karp, appeal from the trial court's November 28, 2017 order entering judgment in favor of Pasceri in the molded amount of $1,243,194.70. In addition, Pasceri appeals from the trial court's January 24, 2018 order denying without prejudice his petition for additional counsel fees.[1] After careful review, we reverse the trial court's November 28, 2017 judgment, and dismiss Pasceri's appeal from the trial court's January 24, 2018 order as moot.

The trial court summarized the procedural history and factual background of this case as follows:

> [Pasceri] prevailed in an action for breach of contract and for violation of the Pennsylvania Wage Payment and Collection Law (["]WPCL["]), 43 Pa.C.S.[] § 2601 *et seq*.
>
> Pasceri, the former president of a mortgage bank owned by Karp, sued to recover money owed to him under a provision of his employment contract that provided for payment of 10% of the

---

[*] Former Justice specially assigned to the Superior Court.

[1] We *sua sponte* consolidate the parties' appeals as they concern related issues and parties. **See** Pa.R.A.P. 513. With respect to the November 28, 2017 order, Karp's appeal is docketed at 68 EDA 2018, and Pasceri's appeal at 288 EDA 2018. Pasceri's appeal from the trial court's January 24, 2018 order is docketed at 651 EDA 2018.

- 2 -

sale price of the business when the business was sold. The locus of the controversy was the language of said employment contract that provided for certain deductions to be made prior to making payment to Pasceri. [Karp] refused to make any payment to [Pasceri] under the contract, arguing he was entitled to take several deductions that would reduce the amount owed [to Pasceri] to zero. [Pasceri] filed suit to recover the money owed and for additional damages under the WPCL for withholding wages.

The matter was tried before the [c]ourt sitting without a jury for three days beginning on June 12, 2017. On August 10, 2017, the [c]ourt found in favor of [Pasceri] and against [Karp]. Findings of fact and conclusions of law were issued. In its findings[,] the [c]ourt awarded [Pasceri] $857,892.60 in compensatory damages. The [c]ourt also found [Pasceri] was entitled to damages under the WPCL. Pasceri and Karp each filed post-trial motions[,] which were denied on November 28, 2017.

Pasceri also filed a motion to mold the verdict to include pre[-]judgment interest and damages under the WPCL in the form of attorneys' fees and liquidated damages. The [c]ourt granted this motion in part and denied it in part, finding [Pasceri] was entitled to pre[-]judgment interest as the result of [Karp's] breach of the contract and attorneys' fees under the WPCL, but not liquidated damages. On November 28, 2017, judgment was entered on the molded finding in the amount of $1,243,194.70.

…

In short[,] the facts are as follows: In 1994, … Karp formed a mortgage bank, Gateway Funding Diversified Mortgage Services, LP ("Gateway")[,] as a Pennsylvania limited partnership. By 2008[,] Karp was the 99% limited partner in Gateway, with the remaining 1% general partnership interest owned by Gateway Funding, Inc.

[] Pasceri became an employee of Gateway in 1998. He was hired to manage Gateway's retail sales division and was very successful. In the spring of 2006[,] Pasceri and Karp began negotiating for Pasceri to assume the position of president and chief executive officer of Gateway. Pasceri requested a 10% limited partnership interest in Gateway, fearing a situation where the company [was] sold and he [was] terminated. Karp did not agree but negotiations continued.

- 3 -

On or shortly before July 21, 2006, Pasceri received a request from Karp's office that he provide to Karp a draft of a proposed employment agreement. On July 21, 2006, Pasceri sent an e-mail to Kristen Koenigsbauer ("Koenigsbauer"), Karp's assistant, which contained his draft of the proposed agreement ("Pasceri Draft Agreement"). The Pasceri Draft Agreement contained all the terms of Pasceri's existing employment arrangement with Gateway, but added two material terms: (1) a "sale clause" that, in exchange for Pasceri's agreement to take on the president and chief executive officer role at Gateway[,] provided that in the event that Karp ever sold Gateway, Pasceri would be paid 10% of the gross sale price of Gateway and (2) a covenant not to compete, which Karp had requested.

Later that evening, Pasceri received a phone call at his home from Koenigsbauer and was advised that his employment agreement with Gateway had to be signed that night. He was directed to meet … Koenigsbauer in the parking lot of the Holiday Inn in Fort Washington in order to sign the agreement. Pasceri met Koenigsbauer as requested.

Pasceri's original draft agreement had been changed. The sale clause at Paragraph 6 no longer provided that Pasceri receive 10% of the gross sale price in the event that Gateway [was] sold. Pasceri understood Paragraph 6 to provide that he would receive 10% of the net increase in value of the company[,] measured from the date he began his new role as president and chief executive officer[,] less any cash contributions that Karp had made to Gateway and not extracted before the date that Gateway was sold.

Pasceri was not happy with this change[,] which was made without his consultation[,] but [he] still signed the agreement because he believed it provided him protection in the event that Gateway [was] sold and would reward him for the increase in value that Gateway might achieve during his tenure. In general, the contract was signed under hurried circumstances.

Paragraph 6 of the Employment Agreement ("Paragraph 6") read as follows:

> 6. Sale Clause: Upon the sale of Gateway Funding or any of its related companies, Bruno J. Pasceri will be entitled to 10% of the actual net cash, stock, or equity profits actually received by the partners after deducting the partners' equity in Gateway as of July 31, 2006, and after deducting all

loans, advances to, or payments or investments for the benefit of, the partnership, along with interest thereon, and further deducting all loans, debts, expenses, transaction fees, taxes, obligations, and liabilities of Gateway.

Pasceri understood the intent of Paragraph 6 to be to provide him with a financial reward in the event he [was] successful in growing the value of Gateway from August 1, 2006, until the time Gateway was sold.

When Pasceri assumed the role as president and chief executive officer of Gateway, the partners' equity in the company was $12,594,554.00. On May 31, 2015, Karp sold Gateway for $30,607,952.00.

At trial[,] the parties agreed for the purposes of calculating the 10% due Pasceri on the "actual net cash, stock, or equity profits actually received by the partners[,]" a deduction would first have to be taken for "partners' equity in Gateway as of July 31, 2006[,]" totaling $12,594,554.00. The parties further agreed a deduction must be taken for Karp's capital contributions since July 31, 2006, totaling $5,534,472.

After making these deductions, a balance of $12,478,926.00 remains. Pasceri's position at trial and in this appeal is that this is the figure from which his 10% share should have been calculated.

Karp for his part believed three additional deductions should be taken: (i) Gateway's Accumulated Profits[2] of $15,370,488.00 from August 1, 2006 to May 31, 2015; (ii) [l]oss on loans transferred from Gateway to Karp in 2008 in the amount of $5,700,000.00 ($3,900,000.00 incurred to date plus $1,800,000.00 projected at some future time); and (iii) interest from August 1, 2006 to May 31, 2015 on Karp's net contributions to Gateway, in the amount of $4,264,048.00….

---

[2] According to Pasceri's expert, David Duffus, "another term for accumulated profits is retained earnings." N.T. Trial, 6/14/2017, at 168. Karp's expert, Joseph Lesovitz, explained that accumulated profits are "retained earnings that are held in the partner's capital account of Mr. Karp. So Mr. Karp's partner's capital account contains the accumulated profits or reinvested profit." N.T. Trial, 6/19/2017, at 17.

The [c]ourt concluded Karp was not entitled to a deduction for accumulated profits. These profits were [the] property of the partnership, Gateway, and not Karp. Furthermore[,] it was necessary for those accumulated profits to remain in the partnership and not be distributed so Gateway could remain in compliance with its loan covenants with its warehouse lenders. Paragraph 6 was ambiguous with respect to Karp's entitlement to deduct his accumulated profits, and therefore the language of the contract must be construed against the drafter, Karp. The [c]ourt also found that interpreting Paragraph 6 to allow this deduction, which would inevitably lead to a pay-out under the contract of zero dollars, would lead to an unfair result.

The [c]ourt also found the contract was ambiguous with respect to which kinds of interest were deductible by Karp and[,] construing this ambiguity against him as drafter[,] declined to allow a deduction for interest on net contributions. According to the testimony of [Pasceri's] expert, charging interest on net contributions is not a typical practice.

The [c]ourt further found [Karp] was entitled to a deduction for his losses on non-performing loans he repurchased from Gateway to preserve its solvency. In 2008[,] Karp, on the advice of his auditors and Pasceri, repurchased $8,400,000.00 in non-performing loans in order to keep Gateway from sustaining a major loss that could lead to Gateway's warehouse lenders to cease providing loans.

These repurchases by Karp were in essence capital contributions to the firm. The [c]ourt found Karp ultimately lost $3,900,000.00 on these loans. Claims by Karp of an additional $1,800,000.00 in future losses were too speculative.

The [c]ourt also found [Pasceri] was an employee of [Karp] within the meaning of the WPCL, and thus the WPCL applied to [Pasceri's] damages. Under the statute[, Pasceri] was entitled to attorneys' fees pursuant to 43 P.S. § 260.9a(f)[,] but not liquidated damages under 43 P.S. §[] 260.10. Liquidated damages are inappropriate in a case where there is a good faith dispute over payment.

Trial Court Opinion (TCO), 2/21/2018, at 1-6.

On December 21, 2017, Karp filed a timely notice of appeal from the court's November 28, 2017 judgment. On January 3, 2018, Pasceri filed a timely cross-appeal. Each party timely complied with the trial court's instruction to submit concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Moreover, on December 11, 2017, Pasceri filed a petition for a supplemental award of attorneys' fees, which the trial court denied without prejudice on January 24, 2018. On February 22, 2018, Pasceri filed a notice of appeal from the trial court's January 24, 2018 order. The docket does not indicate that the trial court directed Pasceri to file a Rule 1925(b) statement for this appeal.

For ease of disposition, we will first address the following issues raised by Karp in his appeal docketed at 68 EDA 2018:

> 1. Did the [c]ourt err in finding and concluding that the profits generated by Gateway from its operations (the "accumulated profits") belonged to Gateway and not to Karp[?]
>
> 2. Did the [c]ourt err in finding and concluding that Karp could not deduct the accumulated profits he had invested in Gateway for the benefit of Gateway pursuant to the Paragraph 6 phrase "after deducting all loans, advances to, or payments or investments for the benefit of, the partnership["?]
>
> 3. Did the [c]ourt err in finding and concluding that this Paragraph 6 phrase was ambiguous with respect to Karp's entitlement to deduct the accumulated profits he had invested in Gateway for the benefit of Gateway[?]
>
> 4. Did the [c]ourt err in finding and concluding that, if Karp was entitled to deduct his accumulated profits he had invested in Gateway for the benefit of Gateway pursuant to Paragraph 6, such a deduction would lead to an absurd result and would render Paragraph 6 meaningless[?]

5. Did the [c]ourt err in finding and concluding that, because Karp's interpretation of Paragraph 6 would result in Pasceri['s] not receiving a recovery thereunder, such an interpretation would lead to an absurd result and would render Paragraph 6 meaningless[?]

6. Did the [c]ourt err in finding and concluding that Karp could not deduct any interest pursuant to the Paragraph 6 phrase "after deducting all loans, advances to, or payments or investments for the benefit of, the partnership, along with interest thereon["?]

7. Did the [c]ourt err in finding and concluding that this Paragraph 6 phrase was ambiguous with respect to Karp's entitlement to deduct his interest on the net contributions he had indisputably invested in Gateway for the benefit of Gateway[?]

8. Did the [c]ourt correctly find and conclude that Karp was entitled to a loan loss deduction pursuant to Paragraph 6, but err[ed] in limiting Karp's deduction to $3,900,000 instead of the $5,700,000 claimed by Karp[?]

9. Did the [c]ourt err in finding and concluding that the negotiations of Paragraph 6 and circumstances surrounding the execution of Paragraph 6 were relevant when the Paragraph 6 phrase "after deducting all loans, advances to, or payments or investments for the benefit of, the partnership, along with interest thereon" was not ambiguous[?]

10. Did the [c]ourt err in finding and concluding that Pasceri's understanding of Paragraph 6 was relevant when the Paragraph 6 phrase "after deducting all loans, advances to, or payments or investments for the benefit of, the partnership, along with interest thereon" was not ambiguous[?]

11. Did the [c]ourt err in finding and concluding that Paragraph 6, Pasceri and Pasceri's rights under Paragraph 6 were covered by the WPCL[?]

12. Did the [c]ourt err in finding and concluding that Pasceri was entitled to attorneys' fees pursuant to the WPCL because Pasceri was not entitled to any recovery under Paragraph 6, because Pasceri's request for attorneys' fees included time and costs expended for issues Pasceri lost at trial and on his post-trial motions and because, even if he was entitled to a recovery, his right thereunder was not covered by the WPCL[?]

13. Did the Court err in finding and concluding that Pasceri was entitled to pre[-]judgment interest because Pasceri was not entitled to any recovery under Paragraph 6, because Pasceri's counsel never proffered any cause — much less "good cause" — for his untimely request for pre[-]judgment interest, because Pasceri's request for pre[-]judgment interest was untimely and because the Pennsylvania Supreme Court has never clarified or decided its split [j]udgment of the Court in **Kurtas v. Kurtas**, 555 A.2d 804 (Pa. 1989)[?]

Karp's Brief at 5-8.

At the outset, we point out that Karp raises thirteen issues in his statement of the questions involved. However, Karp does not divide the argument section of his brief into thirteen corresponding parts; instead, he divides it into six, incongruous sections. We admonish Karp for his lack of compliance with Pa.R.A.P. 2119(a). **See** Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."); **Donaldson v. Davidson Bros., Inc.**, 144 A.3d 93, 99 n.9 (Pa. Super. 2016) (determining that the appellant failed to comply with Rule 2119(a) where the appellant's brief did not "present and develop eight arguments in support of the eight questions raised"). Notwithstanding, Karp's noncompliance does not preclude our review.

As we address Karp's issues, we keep in mind our standard of review:

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial

- 9 -

judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue … concerns a question of law, our scope of review is plenary.

The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

**Stephan v. Waldron Elec. Heating and Cooling LLC**, 100 A.3d 660, 664-65 (Pa. Super. 2014) (citation omitted). Further, we recognize:

The interpretation of any contract is a question of law and this Court's scope of review is plenary. Moreover, we need not defer to the conclusions of the trial court and are free to draw our own inferences. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

**Id.** at 665 (citation omitted).

As Karp's first five issues challenge the trial court's determination that Karp had no right to deduct accumulated profits, we examine them together.[3] In sum, Karp argues that the trial court erred in concluding that "Karp's accumulated profits belonged to Gateway and were not therefore a capital investment in Gateway." Karp's Brief at 49. Karp also contests the trial court's assessment that "[t]he contract was 'ambiguous as to the right of Karp to

---

[3] Karp also addresses these five issues together in his brief.

deduct accumulated profits' because the parties' two experts 'disagreed on whether accumulated profits should be considered an investment.'" ***Id.*** at 49-50 (some internal quotation marks omitted). Finally, Karp challenges the trial court's observation that "if Karp were permitted a deduction for his accumulated profits, it 'would lead to an unfair result' for Pasceri, since he would not receive a 'payout upon the sale of the company.'" ***Id.*** at 50. In rejecting Karp's accumulated profit deduction, it appears that the trial court relied on all of these considerations.

First, in determining that the accumulated profits did not constitute an investment made by Karp, the trial court reasoned,

> Gateway's profits derived from its business activities were undoubtedly acquired in the name of the partnership and were thus partnership property. The reservation of these profits in the [limited partnership] was in fact necessary to the carrying on of the business. Had Karp chosen to withdraw[] them[,] Gateway would not have been able to secure the financing vital to Gateway's operation. These profits were not available for distribution and were therefore not a capital contribution.

TCO at 7. We disagree.

Despite its emphasizing that Gateway existed as a limited partnership — an entity separate and distinct from Karp — the trial court contradictorily notes that Karp could have chosen to withdraw the accumulated profits from Gateway. ***See id.*** at 7, ***supra*** ("Had Karp chosen to withdraw[] them…."). Indeed, Pasceri even acknowledged at trial that Karp chose to leave his accumulated profits in the business:

> [Karp's attorney:] Now, is it your position that Mr. Karp did not leave his accumulated profits in the business?

[Pasceri:] They're the company's accumulated profits, not Mr. Karp's.

[Karp's attorney:] He's 100 percent owner; correct?

[Pasceri:] He is 99 -

[Karp's attorney:] Well, that was as a limited partner. He was also the general partner; correct?

[Pasceri:] There was a 1 percent general partnership above that in the holding company, yes.

[Karp's attorney:] And, so, he owned all 100 percent; correct?

[Pasceri:] Correct.

[Karp's attorney:] And he left his profits in this business from 2006 to 2015; correct?

[Pasceri:] I would say from 1994 to 2016, if you want to be accurate.

[Karp's attorney:] All right. And – but, certainly, he did it from 2006 to 2015; correct?

[Pasceri:] Sure.

[Karp's attorney:] And he did that to sustain the operations and for the benefit of the business; correct?

[Pasceri:] To build the business, sure.

N.T. Trial, 6/12/2017, at 120-21.

Neither the trial court nor Pasceri can ignore the reality that, although structured as a limited partnership, Gateway's only limited partner and the sole owner of Gateway's corporate general partner was Karp. Pasceri argues that "the decision about whether to make distributions belongs to the partnership…[,]" but he overlooks that Karp is the sole decision maker in the partnership. *See* Pasceri's Reply Brief at 11. Karp controlled the partnership and, consequently, its accumulated profits, regardless of whether he actually

received a distribution. As Karp's attorney persuasively asserted at trial, as the 100 percent owner, Mr. Karp "didn't have to leave the profits in. The business could have gone down, could have folded. He didn't have to leave them in. He chose to leave them in. That was his decision." N.T. Trial, 6/19/2017, at 142. Thus, we disagree with the trial court that the accumulated profits did not constitute an investment made by Karp merely because Gateway did not distribute them to him.

Second, the trial court ascertained that the contract was ambiguous because the two experts that testified on behalf of the parties "disagreed on whether accumulated profits should be considered an 'investment.'" TCO at 7-8. The trial court stated that "[t]he evidence was clear that the phrase 'investments' was susceptible of multiple interpretations. Therefore, this language must be construed against the drafter." *Id.* at 8. Again, we disagree.

Initially, we observe that "[t]he fact that the parties have different interpretations of a contract does not render the contract ambiguous." *Tuthill v. Tuthill*, 763 A.2d 417, 420 (Pa. Super. 2000) (citation omitted). Instead, "[a] contract will be found to be ambiguous only if it is fairly susceptible of different constructions and capable of being understood in more than one sense. It is the function of the court to decide, as a matter of law, whether the contract terms are clear or ambiguous." *Id.* (citations omitted).

Although Pasceri proffers a different interpretation of the contract than Karp, we view Pasceri's interpretation as contrived and unconvincing. At trial,

- 13 -

Pasceri's expert, Duffus, gave the following explanation as to why the accumulated profits were not an 'investment for the benefit of the partnership' under Paragraph 6:

[Pasceri's attorney:] [D]o you disagree with Mr. Lesovitz's[, Karp's expert,] interpretation of [P]aragraph 6, with respect to the accumulated profits deduction?

[Duffus:] I do. As I mentioned a few moments ago, I think it's an attempt to shoehorn accumulated profits into one of the four terms that are set forth in [P]aragraph [S]ix, and I just don't believe that accumulated profits are any of those.

If we look at some of the terms that were set out there for deductions, loans, advances to, payments or investments, those are all actions. We look at the concept of an investment in the context of, let's say, a shareholder making a contribution to a company. That's an action where they contribute an asset, say it's cash, and in return get a change or an increase in their equity.

When we look at accumulated profits, first of all, those are profits that are generated by the company and that are retained in the company for its use – for its operational use going forward, so that's not an action, it's kind[] of a passive activity if you're going to try to fit it into one of those categories.

***

[Pasceri's attorney:] Let's move on to the word "investment" then, that does not appear anywhere as a defined term in this agreement, either; does it?

[Duffus:] No, it does not.

[Pasceri's attorney:] Define "investment"?

[Duffus:] Well, I think there can be many ways to use the term "investment." So think about the context of where somebody makes an investment in a stock[,] right? They buy an ownership interest in a company. That may be considered an investment.

You know, that word is oftentimes used – think about buying a car, a lot of people will say, well, here's your investment in your new car, or here's your investment in your house. So, generally,

- 14 -

> what it is, is, the outlay of an asset, again, cash in most cases, for an ownership interest in something.

N.T. Trial, 6/14/2017, at 88-89, 92-93. Later, on cross-examination, Duffus further testified to distinguish accumulated profits from Karp's contributions:

> [Karp's attorney:] Did you say in your testimony on direct that the reason you did not think accumulated profits were an investment was because it was [*sic*] left in passively?

> [Duffus:] I think I used the word passively in my testimony, if I recall. But I think, conceptually, what I was discussing is that, again, distinguishing between the components of book value or partner's equity in looking at net contributions as being an action.

> And I think I testified that, in my mind, it meets the criteria of an investment, because there's a transfer of an asset, cash, for instance, in return for an increase in equity.

> When I talk about accumulated profits, I don't view that as any one of those four action words, loans, advances, payments or investments, and the reason why I don't is because, first of all, those are profits – the accumulated profits represent the profits generated by the company and retained in the company. And, so, there's not an action, if you will, taken in this case by Mr. Karp with respect to those accumulated profits. They are generated by the company and they're retained by the company.

> [Karp's attorney:] So is the word "passive" that you use really irrelevant to this consideration? I'm just trying to understand where that fits into your opinion.

> [Duffus:] Yeah, I don't know that we necessarily need that word - I only use the word "passive" because I think it distinguishes an action from how I characterized accumulated profits.

> [Karp's attorney:] Well, if Mr. Karp took out $2 million in profits and then put it back in 30 days later, would you regard that as an investment?

> [Duffus:] It may be. I mean, I don't know if it's the same funds that are going in, so on and so forth. But, certainly, if he puts $2 million back into the company, I would consider that an investment.

*Id.* at 134-35.

Relying on Duffus's testimony, Pasceri argues that "'investment' connotes an 'active effort' through the 'outlay of an asset.'" Pasceri's Reply Brief at 11 (citations omitted). Pasceri insists that "the profits that Gateway accumulated required no action from Karp." *Id.* at 12. However, based on our review of the record, leaving the accumulated profits in the partnership was not a passive or thoughtless matter. To be sure, Pasceri acknowledges that "Gateway kept profits for the benefit of the partnership instead of distributing them. The reason Gateway did not make distributions … was to satisfy the covenant requirements under Gateway's warehouse loans for partner's capital." *Id.* (citation omitted); *see also* N.T. Trial, 6/14/2017, at 89 (setting forth testimony by Duffus that accumulated profits are retained in the company for "its operational use going forward"). The trial court also found that "[a]s Gateway's business grew, Gateway's lines of credit would increase, and Gateway's warehouse lenders would require Gateway to retain higher levels of accumulated profits." *See* Trial Court's Findings of Fact and Conclusions of Law, 8/9/2017, at 7. Thus, Karp — who controlled Gateway — deliberately chose to keep the accumulated profits in Gateway to sustain the business and keep it growing. We consider these accumulated profits to constitute, unambiguously, an investment for the benefit of the partnership.

Finally, the trial court determined that "the interpretation urged by Karp would lead to an unfair result." TCO at 8. It reasoned that:

> [Pasceri] testified credibly that Paragraph 6 resulted from negotiations between himself and [Karp] over the means of compensating [Pasceri] for his efforts in growing the company and

to protect him in the event the company were sold. [Pasceri] in fact originally sought an ownership stake in Gateway as a means of accomplishing this purpose. Instead[,] Pasceri accepted Paragraph 6, which was drafted by Karp and signed at an unusual place and time and under hurried circumstances, which instead provided a payout upon the sale of the company.

The [c]ourt found that allowing a deduction for accumulated profits prior to calculating Pasceri's 10% would lead to a payout to him of zero dollars, *under all circumstances.*[4] This would render Paragraph 6 in the contract entirely superfluous and nugatory.

*Id.* (emphasis in original). Again, we disagree that Pasceri is due relief on this basis.

This Court has explained:

**Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains.** Once a person enters into a written agreement[,] he builds around himself a stone wall, from which he cannot escape by merely asserting he had not understood what he was signing. It should not be assumed that the parties were ignorant of the meaning of the language employed.

***Nicholas v. Hofmann***, 158 A.3d 675, 693 (Pa. Super. 2017) (citations and internal quotation marks omitted; emphasis added); ***see also*** Karp's Brief at 58.

_____

[4] In making this statement, the trial court appears to have found that "[c]ompanies in the mortgage lending industry sell for book value, which is equal to accumulated profits and the partners' net contributions." Pasceri's Brief at 21; ***see also*** Karp's Brief at 56 ("The trial court's premise was predicated on trial testimony that mortgage origination companies were **customarily** sold for 'book value'....") (emphasis in original). Karp, however, contends that, "before the global financial crisis, both Karp and Pasceri hoped that they could grow the Gateway business so it could be sold for a multiple of its book value." Karp's Brief at 56-57 (citation omitted).

Here, Karp observes that "despite the hurried circumstances, [Pasceri] did not ask for any delay before signing his Employment Agreement to discuss it with an attorney and, most importantly, no one made him sign it." *Id.* at 57 (citations omitted). Moreover, Karp points out that, "to evidence [Pasceri's] understanding of what he was signing, he signed his name immediately below Paragraph 6 as well as at the end of the Employment Agreement." *Id.* Although the contract may not have been a good bargain for Pasceri or fully understood by him, we decline to override the express language of the agreement in order to save Pasceri from facing an 'unfair result.' As discussed above, we view the contract as allowing Karp to deduct his investments — specifically accumulated profits — which would entitle Pasceri to no recovery under Paragraph 6.[5] Accordingly, we reverse the trial court's judgment entered in favor of Pasceri.

As a result of our disposition, we need not address the remaining issues raised by the parties in their appeals docketed at 68 EDA 2018 and 288 EDA 2018.[6] Moreover, we deem Karp's pending application to remand to the trial

_____

[5] As Karp notes, "[s]ince Karp's accumulated profits deduction [$15,370,488], … would exceed the agreed upon balance of $12,478,926, Pasceri would not be entitled to any recovery pursuant to Paragraph 6 on his breach of contract claim." Karp's Reply Brief at 1 (footnote omitted; some brackets added).

[6] Namely, we need not address Karp's issues pertaining to whether the trial court erred in determining that Karp was not entitled to any interest deduction and erred by reducing Karp's loan loss deduction from $5.7 million to $3.9 million. *See* Karp's Brief at 5-9. Further, as this Court has reversed the trial court's decision in favor of Pasceri, Karp's issues pertaining to the WPCL and

court for further proceedings on newly-discovered evidence as irrelevant in light of our disposition and, thus, we deny it as moot. **_See_** Karp's Application to Remand, 9/6/2018, at 1.[7]  Finally, with respect to Pasceri's appeal docketed at 651 EDA 2018, we similarly dismiss it as moot.

─────────────────────────────────────────

prejudgment interest are moot. **_Id._**  Likewise, we need not reach the issues Pasceri raises in his appeal, relating to the loan loss deduction as well as attorneys' fees and liquidated damages under the WPCL. **_See_** Pasceri's Brief at 3.

[7] Therein, Karp claims that — after trial in June of 2017 and the parties' filing of appeals in December of 2017 and January of 2018 — the purchaser of Gateway made a claim for indemnification in the amount of $14,500,000. **_See_** Karp's Application to Remand, 9/6/2018, at ¶ 4.  Karp explains that, "[e]ffective May 30, 2015, Gateway was sold … to UFG Holdings LLC …, which assigned its rights to Gateway to its member, Finance of America Holdings, LLC ('FOAH')[,]" and "[a]s part of the Purchase Agreement, Karp agreed to indemnify FOAH for 'any [l]osses related to the operation of the [c]ompany prior to the [c]losing'…." **_Id._** at ¶¶ 14, 16 (citations omitted).  In short, Karp avers that — from approximately 2016 through 2018 — FOAH had cooperated with an investigation by the Department of Housing and Urban Development ("HUD") that "focused exclusively on the certification of [Federal Housing Administration ('FHA')] loans originated between 2008-2014 by Gateway — the exact time period when Pasceri served as President and CEO of Gateway and was in charge of all of Gateway's mortgage originations." **_See id._** at ¶ 22 (citations and internal quotation marks omitted).  According to Karp, "FOAH believed that, as a result of … HUD's investigation, the United States may pursue claims under the False Claims Act against [it.]" **_Id._** at ¶ 21 (internal quotation marks omitted).  Ultimately, Karp says, FOAH and the Department of Justice reached a $14,500,000 settlement of HUD's claims related to Gateway's FHA mortgage origination business prior to its sale. **_Id._** at ¶ 23 (citation and internal quotation marks omitted).  Karp has allegedly agreed to indemnify FOAH in that same amount. **_Id._** at ¶ 24 (citation omitted).  Consequently, Karp requests that we remand this case to the trial court for further proceedings to consider this newly-discovered evidence, as he asserts "[t]his indemnity obligation either reduces the funds actually received by Karp for the sale of Gateway or was an existing liability of Gateway under Paragraph 6." **_Id._** at ¶ 32.

Judgment entered on November 28, 2017 reversed. Appeal docketed at 651 EDA 2018 dismissed as moot. Jurisdiction relinquished.

President Judge Emeritus Stevens joins this memorandum.

Judge Nichols files a concurring and dissenting statement.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/5/19