Marcy GREEN

v.

EDWARD J. BETTINGER COMPANY.

Civ. A. No. 82–5579.

United States District Court,
E.D. Pennsylvania.

Sept. 10, 1984.

Alan M. Lerner, Philadelphia, Pa., for plaintiff.

Brenda Kinney, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

On December 15, 1982, plaintiff, acting *pro se,* filed her complaint in this action alleging employment discrimination on the basis of sex and age, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.,* the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq., the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.,* and the Equal Pay Act, 29 U.S.C. § 206(d), and also alleging claims for breach of contract. Although plaintiff proceeded *pro se,* her initial pleading appears to have been the result of competent professional draftsmanship.

In January 1983, plaintiff filed a supplementary document, amending the complaint to reflect the fact that the defendant, originally named as a corporation, is actually a sole proprietorship. At the same time, plaintiff filed what can best be described as a conditional, or cautionary, application for the appointment of counsel. In that document, plaintiff stated that she would be unable to pay counsel except on a contingent fee basis; that she had discussed the case with several different lawyers; that the lawyers she deemed fully capable of handling the case were unwilling to do so on a contingent fee basis; and that she was not satisfied with the professional competence of the attorneys who were willing to handle the case on a contingent fee basis. She further stated that she was continuing her efforts to obtain private counsel, but wished to "alert" the court to the possibility that her efforts would prove unsuccessful, and that an appointment of counsel might become necessary. Eventually, when plaintiff's further efforts to obtain satisfactory counsel proved unavailing, this court appointed counsel to represent her, on November 7, 1983.

Following a pretrial conference on February 21, 1984, this court, by Order dated March 2, 1984, fixed a trial date of June 11, 1984, with leave to the parties to pursue discovery in the interim. Apparently, plaintiff did serve interrogatories and requests for production of documents, which were responded to by the defendant on April 3, 1984.

On May 11, 1984, the defendant filed a comprehensive motion for summary judgment. On May 23, 1984, counsel for plaintiff requested a postponement of the scheduled June 11 trial, for a variety of reasons, principally related to other trial commitments. In that request, plaintiff's counsel stated that he wished to complete discovery in this case in July, and respond to the pending summary judgment motion in August. The defendant did not oppose the requested postponement. Accordingly, on May 30, 1984, the parties were notified that the trial would take place on September 12, 1984.

By letter dated June 6, 1984, counsel for defendant granted plaintiff's counsel an extension of time until July 11, 1984, to file a response to the pending motion for summary judgment. Thereafter, plaintiff's counsel requested a further extension of time until August 15, 1984, and defense counsel acquiesced in that extension.

On August 6, 1984, plaintiff's counsel requested a further postponement of the trial until October 8, 1984. He stated that, because of the necessity of responding to the summary judgment motion by August 15, 1984, he would be unable to complete certain allegedly necessary additional discovery in advance of trial. The request was denied.

No response to the summary judgment motion was filed by August 15. On August 22, 1984, a member of my staff telephoned plaintiff's counsel to inquire whether he intended to respond to the pending motion. Eventually, on August 31, 1984, plaintiff's counsel filed a document entitled "Preliminary Response" to the motion for summary judgment; in essence, this document is merely a request for a further extension of time in which to respond to

the summary judgment motion which had been pending since May 11, 1984.

In the August 22 telephone conversation, and in the preliminary response filed August 31, plaintiff's counsel asserted, for the first time, that certain alleged discovery disputes (not yet presented to this court) needed to be resolved, and additional discovery obtained, in aid of plaintiff's response to the motion for summary judgment. Counsel for the defendant, however, contends that the only discovery requests made by plaintiff which defendant is resisting are few in number, and have nothing to do with the issues raised by the summary judgment motion.

Because summary judgment is a drastic remedy, because procedural defaults are disfavored, and because motions for summary judgment may not be granted by default in any event, I have concluded that the seeming dilatoriness of plaintiff's counsel in responding to the motion for summary judgment should be disregarded. On the other hand, if it is clear that the additional discovery allegedly being sought by plaintiff would add nothing of consequence to the existing record, and that there is no material factual issue to submit to a trier of fact, it is entirely appropriate to dispose of the case summarily, on the existing record.

The only "open" discovery matters alluded to in plaintiff's preliminary response are these: (1) defendant's alleged refusal to disclose certain detailed financial information relating to salary levels in branches or departments other than that in which plaintiff was employed, and (2) the fact that the depositions of two of the principal employees of the defendant have not yet been transcribed. The defendant's motion for summary judgment is supported by lengthy and detailed affidavit, together with business records and other documentary evidence not disputed by plaintiff. The critical facts contained in the defense affidavit cover matters plainly within plaintiff's own knowledge, and are not denied in her affidavit. The documents not yet produced would shed no light on these facts.

While a written transcript of the depositions of defendant's principals would be convenient and desirable, it is obvious that plaintiff and her counsel know what these witnesses said, and there is no suggestion that these witnesses said anything which would be helpful to plaintiff's cause. In short, I am not persuaded that further delay would elicit any significant additional information.

The following facts are, on this record, undisputed:

The Bettinger Company is an unincorporated sole proprietorship, owned and controlled by Edward J. Bettinger, its president. The Bettinger Company is a personnel-placement business. Plaintiff was employed in the "temporary division," which supplies temporary secretarial, clerical and data-processing workers to its customers. In addition, the company operates a permanent placement division, which functions as an ordinary employment agency.

The company has a total of 13 permanent employees. In the temporary division, there are two or three "outside" sales/marketing personnel, primarily involved in soliciting new business, customer-relations, contract negotiation, trouble-shooting, and the like; and five in-house support personnel. Plaintiff was one of the "outside" sales/marketing employees; her formal job title was client service manager.

Plaintiff was first employed by the Bettinger Company in January 1972, when she was hired by Carl Berke, who then served as sales manager of the temporary division. In December 1972, plaintiff was discharged by Mr. Berke. Shortly thereafter, however, Mr. Berke left the employ of the Bettinger Company, and established his own competing business—a step which apparently posed a serious threat to the Bettinger Company, and which later resulted in litigation concerning Mr. Berke's alleged violations of restrictive provisions in his employment contract with Bettinger.

In February 1973, plaintiff was rehired, this time by Mr. Bettinger himself, after

discussions and negotiations which will be discussed later.

All of the permanent employees in the temporary division, including plaintiff, were compensated on the basis of a salary plus commissions. Plaintiff's salary was $165 per week, plus $25 for expenses, or a total of $180 per week. In addition, she was entitled to be paid a 1% commission on monthly client billings of the temporary division in excess of $30,000 per month and not exceeding $45,000 per month; 2% commission on monthly billings between $45,000 and $55,000; and 3% commission on monthly billings in excess of $55,000.

From 1973 through 1975, the total billings of the temporary division did not reach the $30,000 per-month threshold, and plaintiff received no commissions during those years.[1] And it was not until 1977 that monthly billings began to exceed the $55,000 level.

In 1978, plaintiff was paid, in addition to her salary and expenses, commissions of $12,783, based on total billings for that year of $959,789. In 1979, her commissions were $19,764, on total billings of $1,178,783. And in 1980, her commissions were $25,940, on total billings of $1,386,197.

Thus, plaintiff's total annual compensation (not including expense allowance) rose from approximately $12,000 in 1977 to $21,863 in 1978, $28,844 in 1979, and $33,443 in 1980.

In 1977, Jeffrey Bettinger, son of the company president, joined the firm as an employee. It was the senior Bettinger's hope and intention that his son would eventually succeed to the ownership and control of the family business. In 1980, having familiarized himself with the business and having performed to his father's satisfaction, Jeffrey Bettinger was promoted to the position of sales/marketing manager, a newly created post which involved his continuing to perform services essentially similar to those performed by plaintiff (whose title was client service manager) but also involved additional responsibilities relating to supervision of the in-house staff.

As of January 1, 1981, the following compensation arrangements prevailed for employees of the temporary division:

| Name | Weekly Compensation | Comission Schedule |
|---|---|---|
| Marcy Green (plaintiff) | $180.00 | 1% between $30,000 and $45,000; 2% between $45,000 and $55,000; 3% over $55,000 |
| Jeffrey Bettinger (president's son) | $250.00 | 1% over $50,000 |
| Elaine Hill | $200.00 | ½% between $40,000 and $50,000; 1% over $50,000 |
| Deborah Dymond | $200.00 | ½% over $80,000 |
| Eleanor Kramer | $200.00 | ½% over $65,000 |
| Ann Kistner | $220.00 | None |

1. The record establishes that the total annual billings of the temporary division in each of these years did not exceed $360,000. Thus, at least on average, the monthly billings did not reach the $30,000 level. In the absence of monthly breakdowns for those years, and in the absence of any contention by plaintiff to the contrary, I assume that no monthly billing exceeded $30,000, or, if it did, that plaintiff was paid whatever nominal commissions she may have earned. In any event, it is clear that plaintiff acquiesced in the compensation arrangement, and that the statute of limitations precludes any present assertion that she was not properly paid for those years.

For the year 1980, pursuant to the foregoing arrangements, plaintiff received a total of $33,443. Jeffrey Bettinger received a total of $22,481. The total compensation of the other three employees ranged from $10,292.50 to $11,555.

As can be readily perceived, the dramatic increase in plaintiff's compensation between 1978 and 1980, and the great disparity between plaintiff's 1980 compensation and that of other employees in the temporary division, are attributable to the fact that plaintiff's commission on billings in excess of $55,000 per month was 3%, while the commissions of the other employees was either 1% or ½%. So long as those commission arrangements prevailed, the disparities would grow worse as the business expanded, and the efforts of other sales and marketing personnel to increase the company's business would inure principally to plaintiff's benefit rather than their own.

In January 1981, expressing the view that the existing compensation arrangements did not accurately reflect the relative contributions of the various employees to the company's success, and that the commission schedule which had been deemed appropriate in 1973 no longer made sense in view of the company's changed circumstances, Mr. Bettinger proposed and implemented a new commission arrangement for plaintiff. Under the new arrangement, plaintiff was to be paid commissions of ½% on monthly billings between $10,000 and $50,000, and 1% on billings over $50,000.

Plaintiff objected to the change, claiming that it was in violation of her contractual rights. When Mr. Bettinger declined to alter his position, plaintiff retained counsel. Further attempts to negotiate an amicable resolution of the controversy were unsuccessful. Eventually, plaintiff was given a firm deadline for accepting the new commission arrangement. She refused to agree, and resigned from the defendant's employ as of April 10, 1981.

Plaintiff was paid commissions in accordance with the new schedule from January 1, 1981, until the date of termination.

Plaintiff's commissions, under the new schedule, amounted to approximately $4200 on total billings of slightly in excess of $500,000 during this period. If plaintiff had not resigned, and if the company's billings had persisted at approximately the same level for the balance of 1981, plaintiff would have earned about $16,000 or $17,000 in commissions under the new schedule, and would thus have received aggregate compensation in the range of $25,000–$30,000 for the year. Under the old schedule, plaintiff's commissions would have been in excess of $11,000 for the January-March period, and in excess of $33,000 for the year. Her total compensation for the year would have been approximately $44,000. Even under the new schedule, however, plaintiff would have continued to be the highest-paid employee in the temporary division.

## I. *Plaintiff's Claims for Breach of Contract*

■ Plaintiff claims that the defendant's unilateral modification of the commission schedule, and her "constructive discharge" for refusing to accept it, amounted to breaches of her contract of employment. It is clear, of course, that in the absence of an express agreement to the contrary, an employer is free to determine the terms and conditions of employment, and may terminate the relationship at will. By the same token, if an employee is dissatisfied with the terms offered by the employer, the employee is free to resign. The question therefore is whether there was an enforceable contract between plaintiff and defendant which produces a different result in this case.

Before agreeing to return to the defendant's employ in February 1973, plaintiff prepared and submitted to Mr. Bettinger a two-page document which she now relies upon as constituting her contract of employment. Although Mr. Bettinger professes to have no recollection of having initialed or otherwise approved this document, and states that he never regarded it as a binding contract, for purposes of ruling on the summary judgment motion, I

assume that it was in fact initialed by him and that it accurately reflects the terms and conditions of plaintiff's employment, agreed to by both sides. It is nevertheless clear, as a matter of law, that the defendant did not breach this contract.

Most of the document in question is devoted to the "nuts and bolts" of plaintiff's job description and responsibilities, her concept of how the job should be performed, various prospective personnel changes, and plaintiff's precise relationship with other employees. So far as the record discloses, all of these minutiae either became reality or became irrelevant. For present purposes, we are concerned only with the provisions of the contract which may be said to have a bearing upon the duration of plaintiff's employment and the terms of plaintiff's compensation.

The contract does not purport to provide any specific term of employment. Plaintiff concedes that, therefore, she has always been an "at will" employee. Moreover, to the extent that the contract can be said to contemplate at least a reasonable duration of employment, there can be no doubt that the period of reasonableness has long since expired.

The only provisions relating to plaintiff's compensation and commission schedule are those which may be derived from the following language:

"9. The following is the salary and commission schedule I feel I will require as the Branch and the dollar volume stands now in center city, and for the additional dollar volume I feel sure I will help to add for the expansion of the business in the future. This is based on *no less* than three inside people (not including bookkeeping or Permanent staff, receptionists and secretarial and clerical support, etc.). It is also based on two outside people (which includes Carl Berke's replacement). If at anytime, it is agreed that the two of us will negotiate a change to decrease this salary base and/or commission schedule, it is understood and agreed that I will be shown accurate figures and a certified financial statement as to profits, losses, and break even points, and what the actual expenses of the Temporary Dept. are. Then and only then we can negotiate, on what a reasonable cut in my commission or salary can be.

"Conversely, if staff is let go or they leave and are not replaced for prolonged periods of time and *if* this creates a loss of dollar volume and in turn *less* expense to the business, I will be shown accurate profit and loss statements, if this loss of dollar volume affects my commissions due to the prolonged loss of staff, I can request a *reasonable increase* in my commission schedule that is fair to me and fair to management and all the other team members. This agreement also refers to any fringe benefits like insurance, etc. and other items that are to be included along with my salary and commission schedule that have been promised after my hire.

"$165 per-week base salary

"$30–$45,000 at 1%—$45–$55,000 at 2% over $55,000 at 3%."

Preliminarily, it should be noted that this language does little more than establish the parties' understanding of the compensation arrangement that would pertain at the start of plaintiff's resumption of employment; that the schedule was premised upon the circumstance "as the Branch and the dollar volume stands now in center city ..." together with plaintiff's subjective predictions of increases which *she* would be instrumental in producing; that plaintiff recognized the likelihood that changes in the schedule would be required as circumstances might change; and that the parties might later negotiate changes in the commission schedule which would be "fair to me and fair to management and all the other team members". Plainly, the initial commission schedule was not fixed and immutable; and the employer's agreement to negotiate in the future does not bind the employer to accept any particular future proposal.

Moreover, and more importantly, the defendant had the unquestioned right to ter-

minate the entire agreement at any time. The undoubted right to terminate an at-will contract necessarily includes the right to insist upon changes in the compensation arrangements as a condition of continued employment.

I therefore conclude, as a matter of law, that plaintiff cannot prevail upon her breach-of-contract claims.

## II. *Plaintiff's Claims of Discrimination*

Plaintiff was 42 years of age when she left defendant's employ in April 1981. Her claims of discrimination may be summarized as follows: (1) that she was denied a promotion on the basis of age and/or sex; (2) that she was subjected to a reduction in compensation in January 1981 on the basis of age and/or sex; (3) that her resignation, stemming from the reduction in commissions, amounted to constructive discharge, and was based on age and/or sex; and (4) that, during the period of her employment by the defendant, she was denied equal pay for equal work, on the basis of age and/or sex. I perceive no arguable merit in any of these claims, nor any triable issues of fact pertaining to them.

The promotional opportunity to which plaintiff refers had to do with the advancement of Jeffrey Bettinger to the position of sales/marketing manager. For present purposes, I shall assume that, if plaintiff had been appointed to this position, it would have amounted to a promotion, since it apparently entailed additional managerial responsibilities and, arguably, a slightly higher perch on the executive ladder; it should be noted, however, that the new position paid considerably less than plaintiff's existing position. Be that as it may, there are at least two reasons why plaintiff cannot prevail on the promotion issue. In the first place, the alleged discrimination occurred in April 1980. Plaintiff did not file discrimination charges with the Pennsylvania Human Relations Commission until June 28, 1981 (docketed with the EEOC on August 28, 1981). Any discrimination which may have occurred before October 25, 1980, is not actionable, given the 300-day limitations period. In the second place, the position of sales/marketing manager was specifically created for the owner's son; the employer was not obliged to offer the post to anyone else, and did not in fact ever consider plaintiff or anyone else as a candidate for the post. In terms of conventional employment-discrimination jurisprudence, it can be stated either that plaintiff did not meet an essential qualification for the position (since she was not the owner's son) and therefore cannot establish a *prima facie* case; or that the employer has established, beyond dispute, a non-discriminatory justification for the choice that was made. In short, an employer does not violate Title VII or any other anti-discrimination statute by grooming his son to take over the business.

Plaintiff's other claims of discrimination are equally vulnerable. Plaintiff conceded, in her deposition, that she resigned because of the reduction in her commission arrangement, and that, if she had been willing to accept the new schedule, she could have continued in the defendant's employ. On this record, no rational factfinder could properly conclude that age or sex discrimination tainted the defendant's decision to reduce plaintiff's compensation schedule. The employer's justification for the change—to maintain an appropriate relationship between plaintiff's compensation and the results of her efforts, to rationalize the compensation schedule in light of the changed circumstances, to preserve the morale of other similarly situated employees, and to head off a potential, undeserved, windfall for plaintiff—is eminently reasonable, and plaintiff has offered nothing to dispute it.

After plaintiff resigned, at least some of her duties were assumed by a female employee who is older than plaintiff. It is perhaps arguable that some of the functions previously performed by plaintiff were taken over on a temporary basis by Jeffrey Bettinger. The post vacated by plaintiff remained vacant for only a couple of months, and her actual replacement in

that position was, again, a female who is older than the plaintiff. Plaintiff would therefore face a virtually insurmountable obstacle in attempting to make out even a *prima facie* case of discriminatory discharge. In any event, it is undisputed that the sole reason for plaintiff's departure was her dissatisfaction with the new commission arrangement, the non-discriminatory justification for which is, as noted above, really beyond question.

■ Plaintiff's Equal Pay Act claims fail for the rather obvious reason that there is absolutely no evidence, or possibility thereof, that plaintiff was paid less than similarly situated males or younger persons. Plaintiff was paid more than anybody else, and there was no truly comparable position in any event.

### III. *Conclusion*

For the foregoing reasons, the defendant is entitled to summary judgment on all of plaintiff's claims. Judgment will therefore be entered in favor of the defendant.[2]

2. Although the defendant earnestly contends otherwise, I have assumed, for purposes of ruling on the Motion for Summary Judgment, that the temporary employees supplied by the defendant to its clients should be treated as employees of the defendant, and that the defendant therefore had a sufficient number of employees to qualify as an "employer" subject to potential liability under Title VII and ADEA.