Gilbert A. GEHIN–SCOTT, Plaintiff,

v.

NEWSON, INC., formerly known as W.H. Newbold's Son & Co., Inc. and Fahnestock & Co., Inc., Defendants.

Civ. A. No. 93–321.

United States District Court, E.D. Pennsylvania.

March 9, 1994.

James B. Crummett, James B. Crummett & Associates, Philadelphia, PA, for plaintiff.

Andrew D. Tepper, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, Joan R. Sheak, Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Allentown, PA, for defendants.

## MEMORANDUM

BUCKWALTER, District Judge.

I held a non-jury trial on February 16, 1994 and find as follows.

### I. FACTS

Plaintiff (hereafter Gehin–Scott) was born March 29, 1930. Between May of 1971 and April 16, 1990, he was employed by defendant W.H. Newbold's Son & Co., Inc. which through Articles of Amendment changed its name to Newson, Inc. (see prior memorandum of this court dated January 4, 1994 in which summary judgment was granted in favor of Fahnestock & Co., Inc., the other named defendant). Because the parties refer to the defendant as Newbold, I will do the same in this memorandum.

Gehin–Scott was a commission trader specializing in private placement of corporate debt instruments.

Newbold was originally formed as a partnership. During these partnership years, Gehin–Scott was a managing director, a title he retained after Newbold's incorporation. He never had a written contract with defendant. He was an at will employee of Newbold.

Gehin–Scott had a very satisfactory arrangement for most of the 19 years he worked for Newbold. His dissatisfaction was coincidental with the acquisition of Newbold by Hopper Soliday ("Hopper") on or about January 6, 1989.

Hopper instituted a variety of policies which it anticipated would centralize and standardize the business practices and policies of Newbold. Some policies included:

1) Requiring specific treasurer approval before making a trade in excess of one million dollars.

2) Prohibiting the settling of transactions on Fridays or at month's end.

3) Requiring the repeated telephoning of buyers to prompt them to transfer funds so that the capital could be raised in order to pay sellers.

4) Limiting formerly unlimited expense accounts.

5) Eliminating monthly draws for all commissioned employees.

6) Changing and standardizing the method of clearing trades.

7) Reducing company paid executive life insurance.

8) Requiring employee contributions for health insurance.

9) Implementing an incentive plan to enable sales personnel to earn his/her commissions based on volume of business.

The management of Newbold implemented these changes as part of a program to controls costs, increase efficiency and increase profitability. The changes were not aimed specifically at Gehin–Scott but applied to his entire department and other employees at Newbold.

Gehin–Scott was unhappy about many of the changes and more importantly, felt that the changes interfered with his ability to carry out his duties in the best interest of himself and his customers.

In addition, there was during the period of time after Hopper acquired Newbold some adverse publicity concerning Newbold's financial health. One customer of Gehin–Scott allegedly refused to do business with him because of concerns about Newbold's financial stability.

On another occasion in December of 1989, a trade involving a long standing customer, Union Central Life, was almost aborted by Newbold but ultimately was consummated after Gehin–Scott threatened to resign.

Again in March of 1990, Gehin–Scott had secured the approval of a $5 million trade of Reeves Industry notes. After finalizing the deal, Gehin–Scott was told by Newbold's chief of operations that there was no money for the deal. Ultimately, however, this deal was completed but only after arrangements which were significantly different from the manner in which Gehin–Scott was used to operating. Shortly after the Reeves trade, Gehin–Scott resigned on April 9, 1990.

During the time Gehin–Scott was employed by Newbold, he never used his draw. Moreover, the volume of his business did not change significantly between January of 1989 and April of 1990, he admitted. He was able to complete all trades he arranged between January 1989 and April of 1990.

In fact, in some respects Gehin–Scott's department at Newbold got preferential treatment. His 50% commission rate was unchanged after Hopper acquired Newbold and his department was not charged with "negative carry" as others were.

Gehin–Scott was aware prior to his leaving Newbold that he could obtain employment at another brokerage company which he did within days of his leaving Newbold.

There is no doubt that Gehin–Scott did not like the management style after January of 1989. But Newbold never asked him to leave, never threatened him with a discharge and never suggested that he retire. In fact, Newbold wanted him to stay because his business was profitable. When he did announce his resignation, several officers of Newbold, including the president, requested that he talk to them and reconsider his decision. He did not and ultimately brought this suit to receive benefits from a supplementary income plan (SIP) and for alleged violations of ERISA.

Gehin–Scott participated in the SIP established by Newbold in 1986. The SIP was an unfunded plan maintained by Newbold primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.

Of prime importance to this litigation, the SIP provided that if an employee voluntarily terminated his employment prior to his attaining age 65, he would forfeit all his benefits under the plan.

## II. CONCLUSIONS OF LAW

■ Count I of Gehin–Scott's complaint is brought pursuant to Section 1132(a)(1)(B) of the Employee Retirement Income Security Act, 29 U.S.C.A. § 1001 et seq., to enforce his rights under the Plan and to clarify his rights to future benefits. The sole question under this Count is whether Gehin–Scott was constructively discharged?

Count II of the Complaint alleges that Newbold violated Section 1140 of the Employee Retirement Income Security Act [1] and Gehin–Scott seeks appropriate relief pursuant to Section 1132(a)(3)(B). Count II raises the question: if Gehin–Scott was constructively discharged, was he discharged for the purpose of interfering with his right to receive his supplementary income benefit at age 65?

This controversy centers around the changes instituted by Newbold that Gehin–Scott claims resulted in his constructive discharge. This case presents a unique situation, because the changes instituted by Newbold did not apply only to Gehin–Scott. In fact, the changes affected Gehin–Scott's entire department and the whole company. Moreover, Gehin–Scott himself alleges that the changes were instituted because of Newbold's poor financial condition. However, Gehin–Scott also alleged that some of the changes were implemented in order to prevent him from receiving his supplementary income benefits.

---

1. Section 1140 states: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which said participant may become entitled under the plan, this subchapter ..."

## A. Constructive Discharge In Non–Discrimination Case

The constructive discharge doctrine was first adopted by the Third Circuit in a Title VII case. *Goss v. Exxon Office Systems Co.*, 747 F.2d 885 (3d Cir.1984). The court specifically rejected the subjective test applied by some courts that required a showing that the complained of conduct amounted to an intentional course of conduct to force an employee's resignation. *Id.* at 887. The court adopted an objective test requiring a court to find that an employer "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." [2] *Goss*, 747 F.2d at 888. While the *Goss* case was a Title VII case and involved acts of discrimination, this test has been applied to an ERISA action not involving acts of discrimination. *See, Berger v. Edgewater Steel Co.*, 911 F.2d 911 (3d Cir.1990).

In *Berger*, a defendant company was experiencing financial difficulty and in order to cut costs, the company decided to eliminate certain benefits under its pension plan. Management notified *all* employees that the special payment option and the $330 per month supplement were to be eliminated by a certain date. The plaintiffs in that case retired prior to the changes and received the special payment. However, plaintiffs did not receive the supplement and they sued for a violation of § 510 of ERISA.[3] Plaintiffs attempted to establish a prima facia case by proving that they were constructively discharged.

The court explicitly adopted the objective test set out in *Goss:* "[a] court must find that an employer knowingly permitted conditions ... in employment so intolerable that a reasonable person subject to them would resign." *Berger*, 911 at 923. Since this was not a discrimination case, the court simply deleted the words "[conditions] of discrimina-

tion" from the original test. The *Berger* court rejected plaintiff's argument and ruled that merely informing employees of a proposed change in the pension plan did not give rise to a constructive discharge. *Id* at 923. Thus, it appears that the *Goss* test is applicable to non-discrimination cases.

In addition, the court applied the reasoning of *Henn v. National Geographic Soc.*, 819 F.2d 824, 830 (7th Cir.1987), where the Seventh Circuit ruled that in a case challenging early retirement benefits under the ADEA, a constructive discharge occurs only if the plaintiffs show they would have been fired had they turned down an offer of early retirement. In *Berger*, since there was no indication that plaintiff's would have been fired if they had not chosen to retire, there was no constructive discharge. This analysis was also applied in *Gray v. York Newspapers, Inc.*, 957 F.2d 1070 (3d Cir.1992), which was an ADEA claim involving an early retirement offer.

The case at bar does not involve early retirement benefits and it does not appear that this test is applicable to this case. However, *Berger* involved the same ERISA claim as this case and unlike *Henn* and *Gray*, there was no specific early retirement offer. Instead, the employer simply told the employees when the changes would be instituted and the employees retired before the changes took effect. Thus, it is not clear whether this reasoning is applicable in all constructive discharge cases.

■ It is clear, however, that the objective test for determining constructive discharge claims is applicable to nondiscrimination cases. I cannot find from the facts in this case that Newbold knowingly permitted conditions in employment so intolerable that a reasonable person subject to them would resign. Moreover, there is not the slightest hint that plaintiff would have been fired if he

---

**2.** Some recent Third Circuit cases have stated the objective test as follows: whether the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign. *Clowes v. Allegheny Valley Hospital*, 991 F.2d 1159 (3d Cir.1993); *Gray v. York Newspapers, Inc.*, 957

F.2d 1070 (3d Cir.1992); *Schafer v. Board of Public Education*, 903 F.2d 243 (3d Cir.1990). The *Goss* court referred to the above version of the objective test, but simply restated it. Thus, it appears that these tests are the same.

**3.** § 510 of ERISA was the predecessor to § 1140.

had not chosen to resign. Gehin–Scott did not like the new management and the changes in policy it brought about. But these changes did not interfere with his ability to make sales. The changes in the way he had to do business were annoying to him, but I find that they did not give rise to a constructive discharge.

### B. Discharge and At Will Employment

In the absence of an express agreement to the contrary, an employer is free to determine the terms and conditions of employment, and may terminate the relationship at will. *Green v. Edward J. Bettinger Co.*, 608 F.Supp. 35, 40 (E.D.Pa.1984). By the same token, if an employee is dissatisfied with the terms offered by the employer, the employee is free to resign. *Id.*

In *Green,* a female employee sued her former employer for breach of contract and violation of anti-discrimination laws. Her employer decided to implement a new commission arrangement, because the old arrangement did not accurately reflect the relative contributions of the various employees of the company. Plaintiff's monthly commission was reduced. Plaintiff complained about the change and retained counsel to negotiate a settlement. The employer refused to alter its position and eventually the plaintiff was given a firm deadline to accept the new arrangement. Plaintiff refused to agree and resigned from the company.

Presumably, if an employee rejects changes implemented by an employer and does not resign, the employer will either terminate that employee or alter its position. This raises the question whether an employee has to complain about changes or reject those changes before resigning. In *Clowes v. Allegheny Valley Hospital,* 991 F.2d 1159, 1161 (3d Cir.1993), the court decided that a reasonable employee will usually explore alternative avenues before concluding that resignation is the only option. However, this is not required in all cases and an employee could show that working conditions were so intolerable that a reasonable employee would have resigned without remaining on the job long enough to complain or request changes. *Id.*

Plaintiff in the *Green* case claimed that the unilateral change in her commission schedule amounted to a breach of contract and resulted in her constructive discharge. The court found that the plaintiff was an at will employee and since the employer has the undoubted right to terminate an at will employee, the employer necessarily has a right to insist on changes in the compensation arrangement as a condition of continued employment. *Green,* 608 F.Supp. at 42. The court simply rejected plaintiff's constructive discharge claim without discussion or analysis. *Id.* In this case, there is no doubt that Newbold had every right to fire an at will employee and could terminate employees to cut costs. In addition, Newbold could impose changes on an at will employee as a condition of continued employment. However, if the changes Newbold instituted created working conditions so intolerable that a reasonable employee would resign, then Newbold would have in effect terminated the employee. In other words, an employer, who is attempting to cut costs, cannot elect to change working conditions instead of terminating employees where those working conditions are so intolerable that a reasonable employee would resign. As I have previously indicated, Newbold's changes in working conditions and procedures were not so intolerable that a reasonable employee would resign.

### III. CONCLUSION

I find that Newbold did not constructively discharge Gehin–Scott but that he voluntarily resigned. Therefore, he forfeited all his benefits.