2022 PA Super 134

| | | |
|---|---|---|
| ROBERT B. HICKS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GLOBAL DATA CONSULTANTS, LLC | : | No. 746 MDA 2021 |

Appeal from the Order Entered May 17, 2021
In the Court of Common Pleas of Franklin County
Civil Division at No(s):  2018-834

BEFORE:  PANELLA, P.J., KUNSELMAN, J., and KING, J.

OPINION BY PANELLA, P.J.:                    **FILED AUGUST 08, 2022**

Robert B. Hicks appeals from the order denying his motion for post-trial relief after the trial court, in a non-jury verdict, found in favor of his former employer, Global Data Consultants, LLC, ("GDC") and denied Hicks's breach of contract and Wage Payment and Collection Law ("WPCL") claims.[1] Hicks seeks payment of commissions pursuant to GDC's commission schedules, and further argues that he is entitled to a new trial. We affirm.

---

[1] While the trial court's order directed the prothonotary to enter a judgment in favor of GDC, no judgment was entered on the docket. It is well-settled that "an appeal to this Court can only lie from judgments entered subsequent to the trial court's disposition of any post-verdict motions, not from the order denying post-trial motions." **Johnston the Florist, Inc. v. TEDCO Const. Corp.**, 657 A.2d 511, 514 (Pa. Super. 1995) (*en banc*) (citation omitted). However, we may review an appeal in the absence of a properly entered judgment where, as here, the trial court's denial of the motion for post-trial relief was "clearly intended to be a final pronouncement on the matters discussed …." **Id.** at 514 (citation omitted). As such, we will consider this appeal as being properly before this Court.

GDC offers information technology ("IT") services for business, education, and government clients. On February 11, 2011, GDC presented a job offer letter to Hicks for employment as a sales representative to sell IT services. The offer letter stated that Hicks would be paid a salary of $80,000 per year, and that Hicks would be eligible to receive commissions for certain qualified sales of GDC's services. The offer letter also highlighted GDC's requirement that Hicks execute a non-compete agreement and emphasized that Hicks's employment would be at-will: "the representations in this letter … should not be construed in any manner as a proposed contract for any fixed term. It is GDC's policy that all employees are and shall remain an 'at-will' employee of the Company." Offer Letter, 2/11/11. Moreover, GDC's employee handbook stated "[e]mployment with [GDC] is 'at-will' and will last so long as both the employee and [GDC] choose to continue the relationship without limitation on either party. … Nothing in this handbook or in any other oral or written statement shall limit the right to terminate or alter the employment-at-will relationship between [GDC] and the employee." Handbook, 11/1/04, at Section 101 (Nature of Employment).

GDC attached to the offer letter a "Schedule of Commission and Incentives for Robert B. Hicks" ("2011 Commission Schedule"), which set forth its method of calculating the earned commissions. The 2011 Commission Schedule stated that Hicks would receive commission for

> sales invoiced and received from accounts that were acquired by GDC through your direct and primary efforts[;] [c]ommission

compensation will be calculated at the end of each month and paid no earlier than in the last payroll period of the month following the month in which the commission is earned[.]

2011 Commission Schedule, at 1 (unnumbered). Further, Hicks had to be employed by GDC when the commission was due. *Id.*[2]

Under the 2011 Commission Schedule, Hicks would receive 3-4% commission of gross revenue for sales of IT services; 7% commission of permanent staff placement services revenue; and 10% commission of gross profit on hardware/software sales after cost of goods sold. Further, if the customer elected to pay the fixed fee up-front in full, it was GDC's practice to pay commissions on the full amount of the fixed fee 45 days after the end of the month. However, if the customer elected to pay the fee every month, GDC would pay commissions 45 days after the end of the month in which payment was received from the customer.

Notably, GDC did not require Hicks to sign the offer letter or the 2011 Commission Schedule; in contrast, Hicks signed the non-compete agreement before beginning work with GDC in February 2011. GDC paid Hicks commissions consistently with the terms of the 2011 Commission Schedule for nearly three years.

---

[2] We note that the language in the 2011 Commission Schedule was similar to GDC's stated policy for payment of commissions, which required that (1) the sale was acquired through Hicks's direct and primary efforts; (2) GDC received payment from the customer; and (3) Hicks was employed by GDC on the date the commission was due to be paid.

In October 2013, GDC entered into a staffing agreement with Central Susquehanna Intermediate Unit ("CSIU"). GDC paid Hicks, who was the account manager for CSIU, commissions under the 2011 Commission Schedule for the CSIU invoices issued in October, November, and December 2013, for the staffing services performed by GDC.

On January 21, 2014, GDC informed Hicks that it would implement a modified commission schedule ("2014 Commission Schedule") for its sales representatives for all invoices generated in and after January 2014. The 2014 Commission Schedule was substantially similar to the 2011 Commission Schedule, but pertinently stated the following conditions: (1) GDC reserved the right to adjust commission schedules at any time; and (2) the commission was to be made payable to Hicks 45 days following the close of each month. Further, the 2014 Commission Schedule separated staffing commissions from IT services; changed commission rates and commissionable sales amounts; and indicated that the new staffing sales commission rate was to be applied to gross profit rather than revenue, which constituted a departure from the 2011 Commission Schedule. The parties did not negotiate any of the terms of the 2014 Commission Schedule and Hicks did not sign the document. Relevant

herein, GDC applied the commission changes to staffing services provided to CSIU in January 2014 and ultimately paid to Hicks in March 2014.[3]

In June 2014, GDC acquired LAM Systems, Inc., which sold computer hardware and deployment services in the state and local education ("SLED") market. Following the purchase, GDC established a SLED segment within its company. Further, Jeff Sauve, an employee of LAM, became Vice President of the GDC SLED segment. The SLED segment had a specific commission schedule, separate from the above schedules, which paid 2.5% commission on professional services sales revenue and 7% commission on hardware/software sales on gross profits. The SLED commission schedule also included language that GDC could adjust the schedule at any time and that the commission would be paid 45 days following the close of each month. At the time GDC acquired LAM, Hicks had accounts that fell within the purview of the SLED segment; however, these accounts were not transitioned to the

_____

[3] Based upon GDC's policy, it could have applied the 2014 Commission Schedule to commissions for staffing services performed in November 2013 and paid to Hicks in January 2014 and to services performed in December 2013 and paid to Hicks in February 2014 because those commissions had not yet been earned by Hicks when the 2014 Commission Schedule went into effect. However, GDC paid Hicks commission for services performed in 2013 under the 2011 Commission Schedule. According to Hicks, his CSIU commissions were decreased by 90% compared to what they would have been if calculated under the 2011 Commission Schedule and amounted to lost commissions of $55,691.63.

SLED segment and Hicks was paid commissions under the 2014 Commission Schedule.

In July 2014, Hewlett-Packard presented GDC's SLED segment with an opportunity to provide hardware to Agora, an online cyber charter school for K-12 students in Pennsylvania. After initially passing on the opportunity to send a proposal to Agora, Dave Zeiler, who would become Agora's Liaison CEO in August 2014, called Sauve[4] and asked that GDC submit a proposal. Hicks prepared the proposal on behalf of GDC, and Agora ultimately named GDC as its vendor.

GDC chose Hicks to lead the managed solutions/services aspect of the sale. However, Zeiler insisted that Sauve continue to be involved in the process, and Sauve acted as Zeiler's point of contact at GDC. In March 2015, Agora issued its initial purchase order, which was comprised of hardware, customized help desk services, and other customized managed solutions and services.

Prior to the payment of the commission on the Agora sale, GDC determined that it would split the commission between Sauve and Hicks for their respective contributions in securing the account. GDC asked Hicks for his opinion on how the commissions should be divided. Hicks responded that he should receive 80% of the hardware commissions on the Agora sale and Sauve

---

[4] Zeiler and Sauve were former teammates on the Clemson University football team.

should receive 20%. Moreover, Hicks affirmed that he did not want to cut Sauve out of the commission split and that he would respect any decision made by GDC.

In the end, GDC decided that Hicks would receive 100% of the professional services commissions because he handled nearly all of the services aspect, and Hicks and Sauve would each receive 50% of the hardware/software commissions in year one.[5] Relevantly, GDC calculated Hicks's portion of the commission under the 2014 Commission Schedule, while calculating Sauve's commission under the SLED schedule. After the first year of the deal, GDC informed Hicks that the hardware/software commissions would be calculated and paid pursuant to the SLED commission schedule and that Hicks would receive 70% of the commission while Sauve would receive 30% of the commission. Hicks continued to receive 100% of the services commission. In total, Hicks received approximately $200,000 in commissions on the Agora sale.

Eventually, the relationship between GDC and Agora deteriorated when Agora had funding issues. GDC and Agora reached a settlement agreement relating to any unpaid invoices. Despite the settlement agreement and

_____

[5] Notably, Hicks had split commissions with other GDC employees with respect to two other clients. **See** Trial Court Opinion, 3/29/21, at 12 (stating that in September 2013, Hicks agreed to split commissions on the InsuranceNews sale); **id.** at 30-32 (noting that Hicks split commissions on the Clearfield Area School District beginning in August 2015).

subsequent payment to GDC, Hicks did not receive certain commissions, totaling $2,843.52.

On March 28, 2018, Hicks accepted a position with Grainger, Incorporated. Once the non-compete agreement with GDC terminated on March 28, 2019, Hicks formed Fortec Solutions, which was a direct competitor of GDC.

On March 29, 2018, Hicks filed a complaint, followed by an amended complaint, against GDC, alleging breach of contract and a claim pursuant to the WPCL due to underpaid commissions. GDC filed an answer with new matter. Hicks then filed a reply to the new matter. The case proceeded to a non-jury trial in August 2020. Following the conclusion of the trial, the trial court denied Hicks's breach of contract and WPCL claims, except for the $2,843.52 that Hicks was owed following the termination of the Agora agreement. Hicks filed a motion for post-trial relief. The trial court entered an order, denying the motion. This appeal followed.

On appeal, Hicks raises the following questions for our review:

1.  Did the trial court commit an error of law by determining that these commission schedules were not contracts for compensation secondary to Hicks's at-will employment relationship with GDC?

2.  Given that Hicks locked in his right to receive specific CSIU commissions when CSIU signed up for business with GDC, did the trial court err in dismissing Hicks's claims seeking vested-rate commissions and liquidated WPCL damages?

3.  Given that Hicks vested commissions under the 2014 Commission Schedule formulas when the sale closed, did

the trial court err in dismissing Hicks's claims for shortfalls and liquidated WPCL damages resulting from GDC's retrospective deviations from the schedule?

4.    Does **Fleck** [**v. Durawood**, **Inc.**, 529 A.2d 3 (Pa. Super. 1987),]  compel the conclusion that Hicks vested his right to specific commissions when GDC accepted the sales he closed?

5.    Where an error of law controls the outcome of a non-jury trial, this Court may award a new trial with instructions to the trial court[?]

Brief for Appellant at 7-10 (issues renumbered for ease of disposition; extraneous language omitted).

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue concerns a question of law, our scope of review is plenary.

The trial court's conclusions of law on appeal originating from  a non-jury trial are  not  binding  on  an  appellate  court because  it  is  the  appellate  court's  duty  to  determine  if the trial court correctly applied the law to the facts of the case.

**Stephan v. Waldron Elec. Heating & Cooling LLC**, 100 A.3d 660, 664–65 (Pa. Super. 2014) (citation, brackets, and ellipses omitted).

We will address Hicks's first three interrelated claims together. Hicks contends that the 2011 and 2014 Commission Schedules constitute enforceable compensation contracts which obligated GDC to pay him the

promised compensation for the CSIU and Agora sales. ***See*** Brief for Appellant at 45, 57. To that end, Hicks argues that although an at-will employee may be terminated at any time, the doctrine does not preclude an employer's obligation to pay compensation for work completed prior to termination pursuant to an enforceable contract. ***See id.*** at 46-48, 49-50; ***see also id.*** at 50, 52-55 (suggesting that the trial court committed legal error by relying on the "at-will" disclaimer in the offer letter to establish that the 2011 and 2014 Commission Schedules did not constitute contracts).

Specifically, Hicks asserts that the 2011 and 2014 Commission Schedules met the requirements to establish a contract: (1) the job offer letter and 2011 Commission Schedule constituted an offer which was intended to induce Hicks to leave his job; (2) Hicks accepted the offer when he commenced his employment with GDC; and (3) the contract was supported by consideration as GDC agreed to pay commission for Hicks's performance as an account manager. ***See id.*** at 46-49, 52.[6] Hicks claims that the trial

---

[6] We note that Hicks's argument appears to use the concepts of bilateral and unilateral contracts interchangeably in discussing this issue. Notably, "[b]ilateral contracts involve two promises and are created when one party promises to do or forbear from doing something in exchange for a promise from the other party to do or forbear from doing something else." ***Stephan***, 100 A.3d at 665 (citation omitted). "Unilateral contracts, in contrast, involve only one promise and are formed when one party makes a promise in exchange for the other party's act or performance." ***Id.*** (citation omitted). Here, based upon Hicks's stated claim and the facts of the case, he is arguing that he entered into a unilateral contract with GDC. Hence, we will proceed under this construct.

court failed to understand that an employer's payments of wages to an employee evidences a compensation contract in every employment relationship and in no way threatens Pennsylvania's at-will employment presumption; according to Hicks, the trial court's finding threatens employees across the Commonwealth and the right to obtain wages under the WPCL. ***See id.*** at 56.

As a result, Hicks contends that he locked in the commissions established by the 2011 Commission Schedule when he closed the CSIU sale in 2013, and that GDC could not apply the 2014 Commission Schedule to this sale. ***See id.*** at 65-67. Hicks argues that GDC's payment of reduced commissions resulted in losses of more than 75% and seeks judgment in his favor in the amount of $55,691.63 in commission shortfalls and $8,131.92 in liquidated WPCL damages. ***See id.*** at 66-67.

Likewise, Hicks claims that the 2014 Commission Schedule controls his commission for the Agora sale. ***See id.*** at 67-68. Hicks highlights that the 2014 Commission Schedule does not permit GDC to split his commissions and does not premise his commissions on any minimum level of effort-accounts that were acquired by GDC through Hicks's direct and primary efforts. ***See id.*** at 69-70. Hicks seeks judgment in his favor in the amount of $189,930.28 in commission shortfalls and $47,482.57 in liquidated WPCL damages. ***See id.*** at 69, 71.

"The presumption of at-will employment confers a legal status upon employees hired for an undefined term of employment which addresses a particular aspect of the employment relationship—the ability of both employer and employee to terminate their employment relationship at any time without explanation or cause." ***Braun v. Wal-Mart Stores, Inc.***, 24 A.3d 875, 942 (Pa. Super. 2011) (citation omitted). "The doctrine does not, however, address other aspects of the employment arrangement, such as issues regarding the promised form and amount of compensation for work completed prior to an employee's termination." ***Id.*** (citation omitted). Essentially, the "doctrine does not relieve an employer of its contractual obligation to provide the compensation promised in return for an employee's services." ***Id.***; ***see also Sullivan v. Chartwell Inv. Partners, LP***, 873 A.2d 710, 716 (Pa. Super. 2005) (stating that "status as an at-will employee is irrelevant to whether a contract existed to provide compensation during the term of his employment.").

In a unilateral contract in the employment context, "the communication to employees of certain rights, policies and procedures may constitute an offer of an employment contract with those terms. The employee signifies acceptance of the terms and conditions by continuing to perform the duties of his or her job; no additional or special consideration is required." ***Evans v. Cap. Blue Cross***, 269 A.3d 569, 575 (Pa. Super. 2022) (citation omitted).

> [T]he provisions comprising the unilateral contract may be viewed as a contract incidental or collateral to at-will employment. An

employer who offers various rewards to employees who achieve a particular result … may be obligated to provide those awards to qualifying employees, although retaining the right to terminate them for any or no reason.

***Braun***, 24 A.3d at 941 (citation omitted).

Further, the WPCL "provides employees a statutory remedy to recover wages and other benefits that are contractually due to them." ***Id.*** at 953 (citation omitted); ***Hartman v. Baker***, 766 A.2d 347, 352 (Pa. Super. 2000) (stating that the WPCL only "establishes an employee's right to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement.") (citation omitted). The WPCL defines "wages" to include the payment of commissions as set forth in an employment contract. ***See*** 43 P.S. § 260.2a. Moreover, if an employee demonstrates that any "amount to be paid pursuant to an agreement remains unpaid, then that employee may be entitled to liquidated damages." ***Braun***, 24 A.3d at 954 (citation, brackets, and quotation marks omitted).

Here, GDC's offer letter for employment explicitly stated that Hicks's employment would be at-will. ***See*** Offer Letter, 2/11/11 at 1 (stating that "[i]t is GDC's policy that all employees are and shall remain an 'at will' employee of the Company. While we ask for reasonable notice, you may terminate the employment relationship at any time, with or without cause, and with or without notice, and the Company retains the similar right."); ***see also*** N.T., 8/25/20, at 37 (wherein Hicks admits that he was an at-will employee). As part of the offer letter, GDC also attached the 2011 Commission Schedule.

*See* 2011 Commission Schedule, at 1 (unnumbered). The parties did not negotiate the terms of the 2011 Commission Schedule and Hicks did not sign either the offer letter or the 2011 Commission Schedule. *See* N.T., 9/15/20, at 64-65.

Moreover, the parties agree that certain conditions had to be met prior to Hicks earning a commission, including: 1) the sale had to be acquired through Hicks's direct and primary efforts; 2) the sale had to be invoiced and GDC had to receive payment from the customer; and 3) Hicks had to be employed by GDC on the date the commission was due to be paid. *See* N.T., 9/1/20, at 149-51 (wherein Thomas Trgovac, an owner of GDC, testified about GDC's method on paying commissions); N.T., 8/25/20, at 40-41, 44-45 (wherein Hicks testified as to the conditions that had to be met to earn commissions); *see also* N.T., 9/15/20, at 75 (noting that GDC's policy was that a commission was not earned unless and until all conditions were met). The commissions were paid 45 days after the end of the month in which the customer paid their fee. *See* N.T., 9/1/20, at 151-52.

GDC paid Hicks in accordance with the 2011 Commission Schedule, including for all CSIU invoices issued between October and December 2013. *See* N.T., 9/15/20, at 75; N.T., 8/25/20, at 93; *see also* Hicks Commission Report, 12/1-31/13, at 1-2. On January 21, 2014, GDC notified Hicks that the 2014 Commission Schedule would be implemented and applied to Hicks's invoices beginning in January 2014. *See* N.T., 8/25/20, at 49-50, 151; N.T.,

8/24/20, at 94-95. The 2014 Commission Schedule also stated that GDC could adjust commission schedules at any time; Hicks had to be employed when the commission was due; and the commission would be paid 45 days following the close of each month. *See* 2014 Commission Schedule, at 1 (unnumbered). Hicks did not sign the 2014 Commission Schedule. *See* N.T., 9/15/20, at 71.

GDC applied the 2014 Commission Schedule in calculating Hicks's commissions for CSIU for sales in January 2014 and onwards. *See* N.T., 8/25/20, at 53. Notably, Hicks admitted that he did not immediately earn a commission on the CSIU sale at the time it signed the sales agreement. *See id.* at 56.

In March 2015, Agora ordered hardware, software, and professional services from GDC. *See* N.T., 9/15/20, at 90; N.T., 8/24/20, at 161. Prior to paying the required commission in June 2015, GDC discussed how to divide the commission between Sauve and Hicks based upon their respective contributions in securing the account. *See* N.T., 9/15/20, at 90-91, 140-41. In May 2015, Hicks emailed Michael Coons, then Vice President of Global Development, to discuss the Agora commission split and proposed an 80%-20% split in his favor on the hardware sales but indicated that "you guys have always been fair[,] and I will respect any decision you make." *Id.* at 94.

Subsequently, GDC decided to pay Hicks 50% of the hardware/software commission in the first year of the sales and 100% of the services commission, calculated under the 2014 Commission Schedule. *See id.* at 96-98; *see also*

*id.* at 96-97 (stating that GDC paid Sauve his portion of the hardware/software commission under the SLED commission schedule). GDC then informed Hicks that the hardware commissions for the second year of the Agora deal would be calculated and paid pursuant to the SLED commission schedule – Hicks would receive 70% of the commissions and Sauve would receive 30%. *See id.* at 100. GDC paid Hicks consistently with the split agreement and Hicks did not dispute this arrangement. *See id.* at 98-99; *see also* N.T., 8/25/20, at 92 (wherein Hicks admits that he accepted the split agreement regarding Agora).

Based upon our review of the evidence and case law, we agree with Hicks that the commission schedules constituted unilateral contracts, which he accepted by continuing the performance of his sales position. Preliminarily, although the offer letter and the handbook detailed that Hicks was an at-will employee, the commission schedules do not contain any "disclaimers explaining that it should not be interpreted as a contract." *Evans*, 269 A.3d at 576; *see also Sullivan*, 873 A.2d at 716. A reasonable person in Hicks's position would understand that his continued performance would entitle him to compensation in the form of commission as stated in the schedules. *See Evans*, 269 A.3d at 576-77 (concluding that a unilateral contract was formed where a reasonable person in the appellant's position would understand that her continued performance as an employee would entitle her to benefits under the employer's benefit plan if she met its requirements); *Bauer v. Pottsville*

*Area Emergency Med. Servs., Inc.*, 758 A.2d 1265, 1269 (Pa. Super. 2000) (finding that the employee entered a unilateral contract with his employer where the terms and provisions of the employee handbook created a duty to provide the employee with full-time benefits once he worked 36 hours per week for 90 days). Indeed, GDC was "obligated to pay commissions under the applicable commission schedule in place at the time the commission is due to be paid provided the employee had met all other requirements for the commission to be paid." Trial Court Opinion, 3/29/21, at 40. Accordingly, we conclude that a unilateral contract was formed between Hicks and GDC.

Nevertheless, we conclude that Hicks is not entitled to relief on his breach of contract or WPCL claims that he should receive more compensation for the CSIU and Agora sales. Here, Hicks does not dispute that the unilateral contracts (commission schedules) supplanted his status as an at-will employee. *See* Brief for Appellant at 51; *see also Braun*, 24 A.3d at 943 (noting that compensation contracts modify an employee's at-will status if a reasonable person would interpret the provisions of the contract as establishing an employer's intent to overcome the at-will presumption); *Cooper v. Broadspire Services, Inc.*, 2005 WL 1712390, at *3 (E.D. Pa. 2005) ("[The p]laintiff's bare allegation that her employment relationship was contractual is insufficient to rebut the presumption of at-will employment, particularly in light of the [employer's] employment at-will policy").

It is well-settled that in the context of at-will employment, the employer not only has the power to terminate the employment relationship but may also dictate prospective changes to an employee's terms of employment, including compensation. Under this framework, an employer cannot retroactively modify the terms of compensation for work that has already been completed. ***See Braun***, 24 A.3d at 942; ***see also Green v. Edward J. Bettinger Co.***, 608 F.Supp. 35, 42 (E.D. Pa. 1984) (stating that under Pennsylvania law, "[t]he undoubted right to terminate an at-will contract necessarily includes the right to insist upon changes in the compensation arrangements as a condition of continued employment.").[7] However, when an employer notifies an employee of changes to the at-will employment contract and the employee continues working with knowledge of the changes, the employee has accepted the changed terms. ***See Braun***, 24 A.3d at 942; ***see also Gehin-Scott v. Newson, Inc.***, 848 F.Supp. 585, 589 (E.D. Pa. 1994) (noting that if an employee is dissatisfied with the terms offered by the employer, he/she is free to resign).

In light of the foregoing, because Hicks was an at-will employee, there was nothing prohibiting GDC from prospectively changing the commission schedule. Here, GDC informed Hicks that it was prospectively changing the commission schedule in 2014 for all sales in and after January 2014, and Hicks

---

[7] In effect, modification is an inherent feature of at-will employment since the employer could simply terminate the old contract and offer a new one.

accepted these new and changed conditions by continuing his employment. **See** Brief for Appellant at 51 (wherein Hicks affirms that following GDC's implementation of the 2014 Commission Schedule, he continued to work for GDC for several years afterwards, thereby accepting the changes); **see also** Trial Court Opinion, 3/29/21, at 50. As a result, based upon GDC's policy and the plain language in the 2014 Commission Schedule, Hicks earned his commissions for any sales in January 2014 45 days following the close of the month—March 2014.

Accordingly, GDC did not retroactively change Hicks's pay. The introduction and application of the 2014 Commission Schedule was a prospective change in compensation to Hicks's at-will employment, which was lawfully applied to his CSIU commissions after January 2014. **See Braun**, 24 A.3d at 942; **see also Green**, 608 F.Supp. at 42.

Likewise, the parties explicitly agreed to the commission split for Agora prior to the payment of these commissions, and Hicks ultimately accepted the split commission by continuing his employment. While Hicks makes much of the plain language of the 2014 Commission Schedule and the requirements therein, he wholly ignores that the 2014 Commission Schedule, which predated the Agora commission split, stated that GDC could change the terms of the commissions, and established that the parties were not bound by them. Moreover, Hicks does not raise any issue with his prior arrangements to split commissions with other employees of GDC. **See** N.T., 8/25/20, at 63 (wherein

Hicks admitted that he used the prior split commission agreement when negotiating the split of the Agora commission); *see also* Trial Court Opinion, 3/29/21, at 12, 30-32. Hence, Hicks has not demonstrated that GDC committed legal error in its calculation of the Agora commission. *See Braun*, 24 A.3d at 942; *see also Green*, 608 F.Supp. at 42.

Finally, although Hicks seeks payment of wages under the WPCL, he does not present any pertinent argument relating to the application of WPCL to the facts of this case. *See* Pa.R.A.P. 2119(a). In any event, nothing in WPCL prohibits changing the commission plan for at-will employees if the change was announced before the wages were earned and applies prospectively. Therefore, because GDC was well within its power to prospectively change the commission schedules for their at-will employee Hicks, and Hicks accepted the change in calculation of the prospective commissions, his first three claims are without merit.

In his next claim, Hicks contends that he locked in his right to specific commissions when GDC accepted the sales he closed. *See* Brief for Appellant at 58, 62. Specifically, Hicks claims that if the compensation contract is silent as to when the right to pay vests, "an employee vests their right to be paid specific commissions when an employer accepts the sales opportunity generated by the commissioned employee." *Id.* at 61 (citing *Fleck*, 529 A.2d at 5 ("Pennsylvania follows the general rule that a person employed on a commission basis to solicit sales orders earns or is entitled to his commissions

when the order is accepted by his employer.")); *see also id.* at 58-59, 62-63. Hicks highlights that the 2011 and 2014 Commission Schedules do not clearly define when he earned or vested his right to receive the commissions. *See id.* at 59, 62-63; *but see id.* at 60 (acknowledging that the 2011 Commission Schedule stated that he would be "paid no earlier than in the last payroll period of the month following the month in which the commission is earned.") (emphasis omitted). Hicks asserts that once the sales contracts were executed, GDC could not change the commission formulas that would be applied to future customer invoices. *See id.* at 63. Hicks concludes that the trial court's misapplication of the holding in *Fleck* compels the entry of a judgment in his favor. *See id.* at 63-65.

Under Pennsylvania contract law, the terms of the contract determine when commissions are computed and paid. *See Daniel Adams Associates, Inc. v. Rimbach Pub., Inc.*, 519 A.2d 997, 1004 (Pa. Super. 1987); *see also* 27 Am.Jur. Employment Relationship § 53 ("Generally, an employee's right to a commission depends on the terms of the parties' contract; terms governing the payment of commissions may be a matter of agreement in advance of the employment or become a part of the undertaking during the employment."). However,

> [w]here a contract is silent or ambiguous, Pennsylvania law generally will not divest an employee's right to an earned commission. Unless there is a contract provision to the contrary, an employee selling on a commission basis is entitled to his or her commission on a sale when the sale is made and accepted by the employer.

- 21 -

*Little v. USSC Grp., Inc.*, 404 F. Supp. 2d 849, 854 (E.D. Pa. 2005) (citation omitted); *see also Fleck*, 529 A.2d at 5. Hence, the general rule that a commission is earned when the order is placed, as stated in *Fleck*, is not absolute; it may be altered by a written agreement by, or the conduct of, the parties which clearly demonstrates a different compensation scheme.

Here, the 2011 Commission Schedule stated that "[c]ommission compensation will be calculated at the end of each month and paid no earlier than in the last payroll period of the month following the month in which the commission is earned." 2011 Commission Schedule, 2/11/11. Additionally, the schedule stated that Hicks's "entitlement to receive a commission payment on the date the commission is due to be paid is contingent on [Hicks] having status as a regular full-time employee of GDC on the date that commission is due to be paid." *Id.* Further, the 2014 Commission Schedule stated that Hicks "must be employed by GDC on the date the commission check is due[,] and [c]ommission will be paid monthly and payable to employee 45 days following the close of each month."

The commission schedules explicitly state that compensation will be calculated at the end of each month and paid no earlier than in the last payroll period of the month following the month in which the commission is earned. Moreover, Hicks would only be entitled to the commission if he is a regular full-time employee of GDC on the date that commission is due to be paid. Importantly, Hicks affirmed that to secure the commission, he had to meet

certain conditions pursuant to GDC's policy, including that the sale had to be acquired through his direct and primary efforts; GDC had to receive payment of the invoice from the customer; and he had to be employed by GDC on the date the commission was due to be paid. **See** N.T., 8/25/20, at 40-41, 44-45 (wherein Hicks testified as to the conditions that had to be met to earn commissions); **see also** Reply Brief for Appellant at 20 (acknowledging that **Fleck** does not mean that GDC would have to pay the commission before receiving payment on the invoices or that Hicks would be entitled to commissions after his employment with GDC concluded). To that end, Hicks admitted that he did not receive the CSIU commission at the time CSIU signed the agreement. **See** N.T., 8/25/20, at 56.

Accordingly, the plain language of the commission schedules and the credible testimony and evidence adduced at trial established that Hicks did not earn a commission until all conditions were met. **See** Trial Court Opinion, 3/29/21 at 8-9. ("[Hicks] did not offer any evidence to rebut the testimony establishing that a commission was not earned until all conditions were met and [GDC] paid the commission to the employee."). Finally, the "general rule" stated in **Fleck** does not establish that Hicks's right to his commission "vests" in perpetuity under the commission schedule applicable at the time of the sale, particularly, where, as here, Hicks was an at-will employee and GDC could prospectively change commission schedules. Therefore, contrary to Hicks's

argument, he did not immediately earn the commission at the time of the sales and **Fleck** is inapplicable in this case.

In his final claim, Hicks asserts that this Court must order a new trial with a finding that the commission schedules are contracts. **See** Brief for Appellant at 72-83. According to Hicks, "[a] new trial is necessary to allow for proper factual findings to be made against the backdrop of the appropriate legal framework and in place of those findings made by the trial court in the legal vacuum borne out of the trial court's resolution of the threshold contract issue." **Id.** at 73. Specifically, Hicks argues that addressing the claims in the context of a contract would change the result, noting that the parties offered competing interpretations as to when he earned or vested his right to specific commissions; and the trial court made credibility determinations based upon its finding that no contract existed. **See id.** at 74-83. Hicks claims that a new trial with the framework that the commission schedules are contracts would establish his right to the requested commissions. **See id.** at 83.

We may only grant a new trial if the trial court "clearly and palpably abused its discretion or committed an error of law which affected the outcome of the case." **Rohe v. Vinson**, 158 A.3d 88, 95 (Pa. Super. 2016) (citation omitted). "We will reverse the trial court's denial of a new trial only where there is a clear abuse of discretion or an error of law which controlled the outcome of the case." **Id.** (citation omitted).

As noted above, we agree with Hicks that the commission schedules are unilateral contracts; however, such a finding does not entitle Hicks to relief on his claims. Indeed, in rehashing his claims, Hicks wholly ignores that he was an at-will employee and that GDC could prospectively change the terms of his compensation, including commissions, as part of its power as the employer. Here, GDC changed the commission schedule in January 2014, Hicks acknowledges that he accepted the changes by continuing his employment, and GDC paid Hicks in accordance with the 2014 Commission Schedule for sales after January 2014. Likewise, Hicks explicitly agreed to split the commissions on the Agora sales. Finally, Hicks acknowledges that the conditions triggering his right to the commissions could not be fully met until at least 45 days after the sale was closed. Considering our above discussion, we conclude that Hicks is not entitled to a new trial and his final claim is without merit. ***See id.***

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/8/2022